20 F.3d 445
 UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
Greg HARRIS, Angelo Vagas, Vernon Copeland, Fredel
Williamson, aka Fred Williamson, Defendants-Appellants,
Michael D. Griggs, Defendant-Appellant, Cross-Appellee.
UNITED STATES of America, Plaintiff-Appellee,
v.
Warren FORD aka Bo, Defendant-Appellant.
 Nos. 92-8489, 93-8071.
 United States Court of Appeals,
Eleventh Circuit.
 May 11, 1994.
 
 Bruce S. Harvey, Law Offices of Bruce S. Harvey, Atlanta, GA, for Greg Harris.
 Jake Waldrop, Federal Defender Program, Inc., Atlanta, GA, for Angelo Vagas.
 Thomas J. Hughes, Jr., Marietta, GA, for Vernon Copeland.
 Stanley M. Baum, Bates & Baum, Atlanta, GA, for Fredel Williamson.
 Henry C. Johnson, Jr., Decatur, GA, for Michael D. Griggs.
 Bryan J. Farrell, Asst. U.S. Atty., Atlanta, GA, for U.S. in No. 92-8489.
 Michael J. Trost, Atlanta, GA, for Warren Ford.
 John S. Davis, Asst. U.S. Atty., Joe D. Whitley, U.S. Atty., Atlanta, GA, for U.S. in both cases.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before TJOFLAT, Chief Judge, HATCHETT, Circuit Judge, and MERHIGE*, Senior District Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this consolidated appeal we review the convictions and sentences of the six appellants convicted of: (1) conspiracy to distribute cocaine in violation of 21 U.S.C. Sec. 846; (2) possession with intent to distribute cocaine in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2; (3) possession of a firearm in relation to a drug felony in violation of 18 U.S.C. Secs. 924(c) and 2; (4) money laundering in violation of 18 U.S.C. Secs. 1956(a)(1)(B)(i) and 2; and (5) structuring cash transactions to evade federal reporting requirements in violation of 31 U.S.C. Sec. 5324 and 18 U.S.C. Sec. 2. After reviewing each of the claims on appeal, we reject them and affirm the appellants' convictions and sentences.
 
 FACTS
 
 2
 This conspiracy began in 1986 when appellants Fredel Williamson and Vernon Copeland moved to Atlanta, Georgia, from Miami, Florida, for the purpose of distributing cocaine. Robert Atwater, Williamson's associate, also moved to Atlanta to participate in the distribution of cocaine. After moving to Atlanta, Williamson, Copeland, Atwater, and others made regular trips to Miami to purchase cocaine, importing hundreds of kilograms of cocaine over the course of the conspiracy.
 
 
 3
 In Atlanta, Williamson and Copeland met Michael Griggs, an Atlanta businessman who facilitated the "investment" of the proceeds of the drug conspiracy. In 1987, with Griggs's help, Williamson, Copeland, Atwater, and appellant Greg Harris purchased a restaurant, named "Tuesdays," which they operated for less than a year. Before purchasing Tuesdays, Williamson, Copeland, and Atwater gave Griggs large sums of cash, which Griggs directed his administrative assistant, Linetta Zachary to deposit in a bank. At Griggs's direction, Zachary made thirty-five separate deposits into several accounts, using seven different branches of the same bank, to avoid the federal reporting requirements.
 
 
 4
 In July, 1988, Griggs also purchased an Atlanta nightclub, which he named "Sensations." To purchase Sensations, Griggs made several deposits of less than $10,000, into various bank accounts and then drew a cashier's check against the funds. To pay the insurance premium for the nightclub, Copeland and appellant Warren Ford, a drug distributer for Atwater, provided cash payments, which were later converted into cashier's checks. After Griggs purchased Sensations nightclub, it operated on a cash basis.
 
 
 5
 In 1989, the drug/money laundering conspiracy experienced a series of setbacks which ultimately led to its downfall. On March 26, 1989, law enforcement authorities arrested one of Williamson's drug couriers, Reggie Harris, in possession of nineteen kilos of cocaine. At trial, Harris testified that the cocaine belonged to Williamson. In April, 1989, law enforcement officials arrested a second drug courier, Michael Bush, while he was in possession of fourteen kilos of cocaine. Bush also testified that the cocaine belonged to Williamson. Within weeks of Bush's arrest, Williamson and Griggs became embroiled in an altercation, after which Griggs threatened to call the district attorney. Finally, on May 4, 1989, Zachary reported Griggs to the Internal Revenue Service. The investigation which followed led to the arrests of several of the coconspirators.[1]
 
 
 6
 On October 29, 1990, a United States Magistrate Judge issued a search warrant authorizing the search of Ford's home, 5054 Stoney Point Lane, which he shared with Kathy Luchie and appellant Angelo Vegas. The magistrate judge issued the search warrant, limited to documents, based upon DEA Special Agent Ronald L. Geer's affidavit. In the affidavit Geer relied heavily upon information from four confidential informants.
 
 
 7
 On October 30, 1990, law enforcement officials proceeded to 5054 Stoney Point Lane with the search warrant and arrest warrants for Ford and Atwater. At the residence, agents found Kathy Luchie sleeping in the master bedroom and Angelo Vegas in the back yard feeding Ford's dogs. Agents detained Luchie and Vegas and later arrested them. Shortly after beginning the search, agents discovered approximately ten kilograms of cocaine, with ninety-seven percent purity, $14,000 in cash, and zip lock baggies above the ceiling tiles in the basement.[2] Also in the basement agents found one ounce of cocaine in a Koolaid can with a false bottom, two boxes of sandwich bags, a case containing a set of scales, and a firearm concealed in a pillow case.
 
 
 8
 In Ford's bedroom agents found a briefcase containing $22,000 in cash, drug ledgers and various other documents. Agents also found money wrappers, zip lock baggies, three weapons and a one-gram scale in the bedroom. While searching through the kitchen drawers agents found a razor blade, money wrappers and plastic baggies. On the back deck of the house agents discovered an empty kilo wrapper inside a plastic trash bag.
 
 
 9
 After his detention, Vegas told agents that he worked as the caretaker of the home, washing, doing general maintenance, and taking care of the dogs.[3] Vegas identified the bedroom that he occupied, but admitted having unrestricted access to the entire house. In Vegas's bedroom, agents discovered a carrying case containing a small quantity of cocaine with ninety-seven percent purity, matching the purity level of the cocaine found in the basement. Inside Vegas's wallet agents found Atwater's pager number and several false identification cards, including a Sensations identification card with Vegas's picture but bearing a different name. Although agents arrested Luchie and Vegas shortly after executing the warrant, Ford remained at large until his arrest in February, 1992.
 
 PROCEDURAL HISTORY
 
 10
 On July 31, 1990, a grand jury indicted Ford, Griggs, Williamson, Copeland, Harris, and Atwater, and in a superseding indictment indicted Vegas and Luchie on November 29, 1990. On November 8, 1991, the government filed a second, twenty-four count superseding indictment, naming Griggs, Williamson, Copeland, Ford, Atwater, Harris, and Vegas as defendants. Count I of the second superseding indictment charged Griggs, Copeland, Atwater, Harris, Ford, and Vegas with conspiracy to distribute cocaine between July, 1986, and July 1990. Count II charged Ford and Vegas with possession of cocaine with intent to distribute on October 30, 1990. Count III charged Ford and Vegas with carrying five firearms during and in relation to a drug felony on October 30, 1990. Counts IV through IX charged Griggs, Williamson, Copeland, and Ford with money laundering. The remaining fifteen counts charged Griggs with structuring cash transactions to evade federal reporting requirements.
 
 
 11
 On February 12, 1992, following a four and one-half week trial, a jury convicted Griggs, Williamson, Copeland, Harris, and Vegas on most counts, acquitting Vegas on Count III and Griggs and Williamson on Count V.[4] On May 8, 1992, the district court sentenced Griggs to a term of 168 months imprisonment, Copeland to 360 months, Harris to 292 months, and Vegas to 151 months. On June 30, 1992, the court sentenced Williamson to 84 months imprisonment consecutive to a sentence previously imposed in the Middle District of Georgia.
 
 
 12
 Following his arrest in February, 1992, Ford pleaded not guilty and moved to suppress the evidence seized during the October 30, 1990, search of his home. Following a suppression hearing, a United States Magistrate Judge issued a Report and Recommendation recommending that the district court deny Ford's motion to suppress. The district court adopted the recommendation and denied Ford's motion. Ford and Luchie were tried jointly, and following one mistrial, they were tried a second time beginning October 26, 1992.[5] The jury convicted Ford on the five counts charged in the indictment, and acquitted Luchie. On January 7, 1993, the district court sentenced Ford to 260 months imprisonment on Counts I and II to run concurrently, 240 months imprisonment on Counts VIII and IX, concurrent to the sentences on Counts I and II, and 60 months imprisonment on Count III consecutive to all other sentences.
 
 
 13
 Each appellant filed a timely notice of appeal.
 
 ISSUES
 
 14
 Although appellants raise a myriad of issues, we find each unpersuasive, and address only two: (1) whether the information contained in the affidavit supporting the issuance of the search warrant for Ford's home was stale; and (2) whether the government introduced sufficient evidence of Vegas's guilt to support his convictions for conspiracy to distribute and possession with intent to distribute cocaine.
 
 PARTIES' CONTENTIONS
 
 15
 Ford contends that the information contained in Agent Geer's affidavit was stale, making the search warrant invalid. The government contends that the information in the affidavit was not stale because it contained allegations of continuing activity, and was updated with more current information.
 
 
 16
 Vegas contends that the government failed to introduce sufficient evidence to support the jury's finding of guilt because no evidence showed his knowing participation to support the conspiracy or possession charge. The government contends that it introduced sufficient evidence to support Vegas's conviction because it showed Vegas's knowing and voluntary participation in the drug conspiracy and his knowing possession of cocaine.
 
 DISCUSSION
 
 17
 A. Staleness of Information Supporting Probable Cause
 
 
 18
 Ford contends that the information contained in Agent Geer's affidavit is stale because if fails to show continuous criminal activity. Ford further contends that the information is stale because the search of Sensations, which took place eighteen months prior to the search of his home, was the last known act alleged in the affidavit. Thus, he argues, even if the affidavit alleged "continuous activity," the information was fatally stale due to the long time period between the last known act and the application for the search warrant.
 
 
 19
 To satisfy the probable cause standard, the government "must reveal facts that make it likely that the items being sought are in that place when the warrant issues." United States v. Domme, 753 F.2d 950, 953 (11th Cir.1985). For probable cause to exist, however, the information supporting of the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant. See Sgro v. United States, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932) ("[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time."); United States v. Bascaro, 742 F.2d 1335, 1345 (11th Cir.1984); and Domme, 753 F.2d at 953. Warrant applications based upon stale information fail to create a probable cause that similar or other improper conduct is continuing. Bascaro, 742 F.2d at 1345.
 
 
 20
 When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented. Bascaro, 742 F.2d at 1345; Domme, 753 F.2d at 953; Sgro, 287 U.S. at 210, 53 S.Ct. at 140. In this case-by-case determination we may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched. See United States v. Hooshmand, 931 F.2d 725, 735-36 (11th Cir.1991); Bascaro, 742 F.2d at 1345; Cauchon v. United States, 824 F.2d 908, 911 (11th Cir.), cert. denied, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); United States v. Pless, 982 F.2d 1118, 1126 (7th Cir.1992); United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993); and United States v. Rugh, 968 F.2d 750, 754 (8th Cir.1992). Ultimately, however, even stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material. See Bascaro, 742 F.2d at 1346 (additional circumstantial evidence coupled with defendant's preexisting involvement with conspiracy supported probable cause determination). See also Bucuvalas, 970 F.2d at 940.
 
 
 21
 In this case, Agent Geer supported the warrant application with a thirty-six page affidavit, based upon interviews with four confidential informants and Geer's personal experience as a law enforcement officer. This information described a complex drug and money laundering conspiracy involving Ford, Williamson, Copeland, Atwater, Harris and Griggs, specifically implicating Ford as a drug distributor and money launderer. Although most of the information contained in the affidavit referred to events which took place over two years before Geer applied for the warrant, the affidavit nonetheless alleged a longstanding and protracted criminal conspiracy. Bascaro, 742 F.2d at 1346 ("Protracted and continuous activity is inherent in large-scale drug trafficking operations.")
 
 
 22
 Ford contends, however, that the affidavit fails to allege that the criminal activity was "ongoing" because the last known act alleged in the affidavit, the search of Sensations, occurred eighteen months before Geer applied for the warrant.[6] Contrary to Ford's assertions, the affidavit does discuss Ford's ongoing activity following the Sensations search.[7]
 
 
 23
 Geer's affidavit specifically states that Ford failed to report any earnings or to file income tax returns after 1983, although he earned $1,500 per week as manager of Sensations and purchased the residence at 5054 Stoney Point Lane from Griggs in January, 1989. The affidavit further alleged that as of one week prior to the search, the Georgia Department of Labor records indicated that no state tax was being withheld for Ford. Finally, and most incriminating, Geer's affidavit contained facts suggesting Ford maintained an ongoing relationship with coconspirators:
 
 
 24
 On October 28, 1990, your affiant ... conducted surveillance on the residence of VERNON COPELAND.... At approximately 6:00 p.m. the agent[ ] observed a white Toyota [registered to Ford's girlfriend Kathy Luchie] pull into [Copeland's] driveway.... The vehicle, believed to be driven by ROBERT ATWATERS, left the area and drove directly to [Ford's home] ... where Atwaters is known to reside.
 
 
 25
 This information updated the affidavit and supported the reasonable inference that criminal activity was continuing because it showed that Ford had no visible source of income, yet owned a large house, and that he continued to associate with members of the drug conspiracy. The updated information further showed that coconspirators accessed Ford's house, making it probable that drug-related activities took place or drug-related documents were stored at the house. Because the affidavit alleged ongoing activity and a continuing relationship between coconspirators, the information was not fatally stale. See Bascaro, 742 F.2d at 1346 (information supporting probable cause receives liberal treatment when large drug conspiracy is involved).
 
 B. Sufficiency of the evidence
 
 26
 The grand jury indicted appellant Angelo Vegas for conspiracy to distribute cocaine, possession of cocaine with intent to distribute, and possession of a firearm in relation to a drug felony. The jury acquitted Vegas of the firearm charge, but convicted him of the two drug charges. On appeal, Vegas contends that the district court erred in denying his motion for judgment of acquittal because the government produced insufficient evidence to support his convictions.
 
 
 27
 Whether the record contains sufficient evidence to support the jury's verdict is a question of law that we review de novo. United States v. Kelly, 888 F.2d 732, 739 (11th Cir.1989). Although we conduct our review without special deference to the district court, we review the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor. United States v. Pareja, 876 F.2d 1567, 1568 (11th Cir.1989). See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Johnson, 713 F.2d 654, 661 (11th Cir.1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984).
 
 
 28
 It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among the constructions of the evidence.
 
 
 29
 United States v. Hardy, 895 F.2d 1331, 1334 (11th Cir.1990) (quoting United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), aff'd on other grounds, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).[8] If, however, the record reveals a lack of substantial evidence from which a fact finder could find guilt beyond a reasonable doubt, we must reverse the defendant's conviction. Kelly, 888 F.2d at 740. We apply these standards in reviewing Vegas's claims.
 
 
 30
 1. Conspiracy pursuant to 21 U.S.C. Sec. 846
 
 
 31
 To support Vegas's conviction for conspiracy to distribute cocaine in violation of 21 U.S.C. Sec. 846, the government must prove beyond a reasonable doubt that: (1) a conspiracy existed; (2) Vegas knew of the essential objectives of the conspiracy; and (3) Vegas knowingly and voluntarily participated in the conspiracy. United States v. Andrews, 953 F.2d 1312, 1318 (11th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 3007, 120 L.Ed.2d 882 (1992). To prove Vegas's knowing and voluntary participation, "the Government must prove beyond a reasonable doubt that [he] had a deliberate, knowing, and specific intent to join the conspiracy." United States v. Jenkins, 779 F.2d 606, 609 (11th Cir.1986). The jury is free to infer participation in the conspiracy from the defendant's action or from circumstantial evidence of the scheme. United States v. Cross, 928 F.2d 1030 (11th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991).
 
 
 32
 Vegas does not contest that the government proved that a conspiracy involving some or all of his codefendants existed. Instead, he focuses on the second and third elements of the government's proof, arguing that the government failed to prove he knew of the conspiracy or that he knowingly and voluntarily participated in it. Once the governments establishes the existence of the underlying conspiracy, however, it only needs to come forward with slight evidence to connect a particular defendant to the conspiracy. United States v. Gates, 967 F.2d 497, 499 (11th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992). The government passed this minimal threshold based on the following facts and circumstances.
 
 
 33
 Vegas and Ford were close friends who knew each other since at least the mid-1980s. Sometime after Ford moved to Atlanta, Vegas accompanied him, and thereafter, lived in Ford's home without paying room or board. During the search of Ford's home, agents discovered approximately eleven kilograms of high-purity cocaine, $36,000 in cash, several firearms, money wrappers, zip lock baggies, razor blades, a used kilogram wrapper, drug ledgers, and two scales scattered around the house. Following his arrest, Vegas admitted having access to all parts of the house, and agents discovered cocaine in his bedroom.
 
 
 34
 Vegas contends that this evidence is insufficient to support his conviction because it merely shows his close association with Ford and his mere presence at the crime scene. United States v. Sarro, 742 F.2d 1286, 1298 (11th Cir.1984). We disagree. At a minimum, the evidence showed that Vegas lived in and possessed full access to a house loaded with drug paraphernalia and implements of the drug trade. The evidence also showed that he lived a very comfortable lifestyle without any source of income. Finally, the evidence shows he was a close friend of a cocaine distributor. From these facts and circumstances, reasonable jurors could properly conclude that Vegas knew that a drug conspiracy existed, that Ford distributed cocaine, and used the home in furtherance of the conspiracy.
 
 
 35
 The government also introduced circumstantial evidence of Vegas's voluntary participation in the conspiracy. Cross, 928 F.2d at 1042. Although we do not necessarily agree with the government's assertion that Vegas was a "minion over the drugs," we conclude that because the government proved a conspiracy existed, the following evidence supplied a sufficient basis for a reasonable juror to conclude, beyond a reasonable doubt, that Vegas participated in the conspiracy to distribute drugs.
 
 
 36
 In addition to the evidence showing Vegas lived in the home of a large cocaine distributor and knew of the conspiracy, the government showed that Vegas often accompanied Ford on overnight trips and that on a recent trip, occurring only days before the search, Ford gave Kathy Luchie $1,000 in cash, after he and Vegas returned. This suggests that the trip involved drugs. The government also showed that agents discovered cocaine in Vegas's bedroom with purity matching that of the cocaine found in the basement. The government also showed that at the time of his arrest, Vegas was not gainfully employed, possessed several false identification cards, including one from Sensations nightclub with his picture and an assumed name, and carried Atwater's pager number. Finally, although Vegas claimed that he worked as the caretaker of the home, Luchie testified that he did nothing around the home except care for the dogs and watch television.
 
 
 37
 If viewed in a vacuum, each of these facts may support an innocent explanation. Taken as a whole, however, they provide sufficient evidence for a reasonable juror to conclude that Vegas voluntarily participated in the conspiracy, if only in a minor way. United States v. Obregon, 893 F.2d 1307, 1311 (11th Cir.) (minor participation is sufficient to bring a person into the ambit of the conspiracy), cert. denied, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990); Bascaro, 742 F.2d at 1359. When viewed in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict, the government's evidence was sufficient to allow the jury to infer that Vegas both knew of the conspiracy and voluntarily joined it.
 
 
 38
 2. Possession pursuant to 21 U.S.C. Sec. 841(a)(1)
 
 
 39
 To support Vegas's conviction under 21 U.S.C. Sec. 841(a)(1), the government must prove that he (1) knowingly (2) possessed cocaine (3) with intent to distribute it. United States v. Poole, 878 F.2d 1389, 1391 (11th Cir.1989). See United States v. Morales, 868 F.2d 1562, 1573 (11th Cir.1989). The government may prove each of these elements with direct or circumstantial evidence. United States v. Pruitt, 763 F.2d 1256, 1264 (11th Cir.1985), cert. denied, 474 U.S. 1084, 106 S.Ct. 856, 88 L.Ed.2d 896 (1986). The government may prove constructive possession if it shows a defendant maintained dominion or control over the drugs or over the premises where the drugs are located. Poole, 878 F.2d at 1392.
 
 
 40
 Vegas maintains that the government failed to prove he knew of the cocaine stored in the residence, or that he possessed it with intent to distribute. This contention needs little discussion because as we stated above, the facts and circumstances of this case supported the jury's conclusion that Vegas voluntarily participated in the conspiracy to distribute drugs. Thus, on the substantive possession charge the jury was free to infer that the presence of the cocaine in Vegas's bedroom, with purity matching the purity of the cocaine found in the basement, showed that Vegas knew of the larger stash of cocaine in the basement. Furthermore, Vegas's unrestricted access to the home permitted the jury to reasonably infer that he exercised control over the house and therefore maintained constructive possession of the cocaine found at the house. See Poole, 878 F.2d at 1392 (constructive possession need not be exclusive and can be proven through knowing control over the premises on which the substance is located).
 
 
 41
 Because sufficient evidence exists to support both of Vegas's convictions, we reject his arguments.
 
 
 42
 All other issues on appeal are meritless.
 
 CONCLUSION
 
 43
 We affirm the appellants' convictions in this case and hold that: (1) the information contained in the affidavit supporting the government's search warrant application for Ford's home was not fatally stale because it alleged ongoing activity and the continuing relationship between coconspirators; and (2) the evidence was sufficient to support Vegas's convictions for conspiracy to distribute cocaine and possession with intent to distribute.
 
 
 44
 AFFIRMED.
 
 
 
 *
 Honorable Robert R. Merhige, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 Pursuant to information obtained from Linetta Zachary, Special Agent Ronald Geer obtained a search warrant in May, 1989, to search Sensations nightclub. In the affidavit which accompanied the application, Geer discussed the information received from Zachary and other information suggesting that evidence pertaining to the conspiracy was stored at Sensations. This affidavit also provided the factual predicate for Geer's later application for a search warrant for Ford's home
 
 
 [2]
 After agents discovered the cocaine and money, Special Agent Geer obtained a second, broader search warrant pertaining to drugs and other items related to drug trafficking
 
 
 [3]
 At trial Luchie contradicted this, testifying that Vegas did very little around the house except watch television and feed the dogs. She further testified that Vegas occasionally accompanied Ford on trips out of town, and that following Ford's and Vegas's most recent overnight trip, Ford gave her $1,000 in cash
 
 
 [4]
 Robert Atwater remains a fugitive
 
 
 [5]
 Initially, Kathy Luchie pleaded guilty in October, 1991, and testified on behalf of the government against Griggs, Copeland, Williamson, Harris, and Vegas. Later, however, she withdrew her plea and proceeded to stand trial with Ford
 
 
 [6]
 Paragraph 35 discusses in detail the execution of the federal search warrant on Sensations nightclub, including the seizure of receipts reflecting Ford's cash withdrawals from Sensations
 
 
 [7]
 Ford attempts to distinguish "ongoing criminal activity" from "ongoing activity" during the course of a conspiracy. While this distinction raises an important legal issue for cases involving discrete crimes, such as homicide, it is a distinction without significance within the context of a longstanding drug trafficking conspiracy because seemingly innocent acts may become criminal, see Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942) (an overt act in furtherance of a conspiracy may itself be an innocent act); and United States v. Alvarez, 610 F.2d 1250, 1255 (5th Cir.1980) (overt act need not be criminal and it suffices if innocent act furthers criminal venture), on reh'g, 625 F.2d 1196 (en banc ), cert. denied, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981), when made in furtherance of the ongoing conspiracy. Cf. United States v. Dynalectric Co., 859 F.2d 1559, 1564 (11th Cir.1988) (for statute of limitations purposes, conspiracy continues until the objectives of the conspiracy are abandoned), cert. denied, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989). Thus, acts which are not inherently criminal may become criminal and support a finding of probable cause if committed to further an ongoing conspiracy
 
 
 [8]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc ), this Court adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981