[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15716
Non-Argument Calendar
_____

D.C. Docket No. 1:09-cr-00482-TWT-LTW-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

IVEY GRANT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 6, 2013)

Before MARCUS, JORDAN, and KRAVITCH, Circuit Judges.

JORDAN, Circuit Judge:

Ivey Grant appeals his conviction for conspiracy to possess, with intent to distribute, at least 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B)(vii). He argues that the district court erred in denying his

pretrial motion to suppress wiretap evidence because (1) the affidavit in support of the wiretap application contained information the government knew had been purchased by an informant from another inmate and therefore violated *Franks v. Delaware*, 438 U.S. 154 (1978); (2) the other information in the affidavit was stale; and (3) the remaining portions of the affidavit did not establish probable cause that a crime had been, was being, or was about to be committed.  He also contends that the jury instructions were erroneous because (4) the deliberate ignorance jury instruction should not have been given as the relevant evidence in the case pointed to actual knowledge, rather than deliberate avoidance, of drug trafficking; and (5) the pattern jury instruction on deliberate ignorance was an incorrect statement of the law in light of the Supreme Court's recent decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011).

After reviewing the record and the parties' briefs, we affirm.

## I. FACTUAL BACKGROUND

Mr. Grant owned Hi-Tech Manufacturing Services, a truck-welding shop in Lithonia, Georgia.  Aside from performing welding services, Mr. Grant allowed others to park their trucks on his property.  One such individual was Marlon Burton, whom FBI agents had been investigating for drug trafficking.[1]   In

---

[1] Mr. Burton pled guilty to conspiracy to possess, with the intent to distribute, at least five kilograms of cocaine and at least 100 kilograms of marijuana.  At the time of Mr. Grant's trial, he had been sentenced to imprisonment for 360 months.

2

November of 2008, the FBI sought (and obtained) a wiretap to intercept calls made on a cellular telephone used by Mr. Burton. FBI Special Agent Nikki Badolato submitted an affidavit containing information gathered over the course of the investigation, including information provided by an unidentified cooperating witness (CW-1), a second cooperating witness later identified as Leon Lumsden (CW-2), an undercover FBI agent, and recorded telephone calls. During the course of the investigation, and with the aid of information garnered from this wiretap, the FBI gathered evidence about Mr. Grant's role in Mr. Burton's criminal enterprise.

### A. Wiretap Affidavit:  Information from Mr. Lumsden

The affidavit executed by Agent Badolato included information obtained from Mr. Lumsden, who said that he had met Mr. Burton three years earlier and that he knew individuals "who work[ed] for Burton's drug-trafficking organization." *See* Affidavit [D.E. 219-1 and 219-2] at ¶ 31. "Through these contacts," Mr. Lumsden knew that Mr. Burton was a "high-level cocaine and marijuana distributor" who received narcotics from Mexico. *See id.* Agent Badolato stated that she believed Mr. Lumsden was reliable and that she had attempted to corroborate his information where possible.

Mr. Grant filed a motion to suppress evidence garnered from the wiretap. He argued that Agent Badolato recklessly disregarded the truth when she based her affidavit, in part, upon information obtained from Mr. Lumsden, who had

3

purchased the information relating to Mr. Burton's alleged drug trafficking from Marcus Watkins, another inmate, who in turn sold information to fellow inmates so they could obtain U.S.S.G. § 5K1.1 reductions.[2]  Mr. Grant argued that because the affidavit improperly presented this information as first-hand knowledge, which amounted to "a material falsehood and a material omission . . . [and] a reckless disregard for the truth," he was entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  *See* Motion to Suppress [D.E. 130] at 8, 17.

The government opposed the motion and argued that there was no evidence that Agent Badolato lied or recklessly disregarded the truth when she submitted her affidavit.  At a *Franks* hearing before the magistrate judge, the government argued that the remainder of the affidavit, aside from Mr. Lumsden's information, established probable cause to issue the wiretap order.  The magistrate judge agreed and the district court adopted the magistrate's report and recommendation.

### B.  Wiretap Affidavit:  Information from CW-1

The wiretap affidavit also contained information from another confidential informant, CW-1, who told agents that Marco Duron, a Mexico-based drug

---

[2] During his interview with FBI agents, Mr. Lumsden said he had received the information from a girlfriend.  The source of the information was actually Mr. Watkins' cousin, Katrina McCurty, and Mr. Lumsden had purchased the information from her hoping to receive a sentence reduction.  *See* Transcript of *Franks* Hearing [D.E. 262] at 40-41, 86-87, 104-05, and 109-10. Mr. Grant contends that Agent Badolato should have known that Mr. Lumsden was unreliable because other agents from the FBI and several Assistant United States Attorneys from the Northern District of Georgia knew that he had purchased information from Mr. Watkins.

4

trafficker, had "fronted" Mr. Burton 100 kilograms of cocaine, which was paid back within 3 days. *See* Affidavit at ¶ 17. CW-1 had worked with Mr. Burton in the past; "CW-1, or his associates, regularly supplied Burton with narcotics prior to CW-1 working with the FBI." *Id.* at ¶ 18. During a call with CW-1 in June 2008, Mr. Burton agreed to establish a new narcotics supply line in Atlanta. According to CW-1, during a meeting on July 17, 2008, between Mr. Burton, CW-1, and an undercover FBI agent, Mr. Burton:

- drove CW-1 and the agent in his Mercedes sedan and showed them his residence to prove that his narcotics operation had been profitable;
- stated that he distributed cocaine and agreed to check a list of names to determine whether they were under investigation;
- discussed his $130,000 debt that he wanted to clear up with the cartel in the hope of becoming the sole cocaine distributor in Atlanta;
- negotiated how much each kilogram of cocaine would cost and agreed upon a price of $20,000 per kilogram;
- called individuals inquiring about secluded properties to be used for the narcotics operation;
- "stated that he wanted to run the drug business exclusively out of Atlanta;" and
- drove them to two residences that he had constructed and offered them as stash houses for the narcotics operation.

*See id.* at ¶¶ 19-21.

Other details were discussed on subsequent calls on July 30-31, August 1, September 2-3, and November 5, 2008, during which Mr. Burton told the undercover agent that he was ready to begin distributing drugs. *See id.* at ¶¶ 23-29, 32. Moreover, toll records from August 17 to November 13, 2008, showed that

Mr. Burton contacted known Mexican drug traffickers on multiple occasions.  *See id.*  at ¶¶ 33-37.

### C. Trial Testimony and Jury Instructions

At trial, two cooperating co-defendants testified for the government:  Mr. Burton and Otoniel Herrera, a truck driver who transported marijuana to Hi-Tech.[3] Mr. Herrera testified that he delivered three separate loads of marijuana to Atlanta, which were unloaded at Hi-Tech.  *See* Trial Transcript [D.E. 377] at 310, 318-19, 322.

Mr. Burton testified about Mr. Grant's role in the drug trafficking conspiracy as follows.  *See id.* at 110-16; 126-30; 134-35; 145-46.  Mr. Burton rented space at Hi-Tech to unload large quantities of drugs from trailers coming from Mexico and to load them with drug proceeds for delivery back to Mexico.  Mr. Burton paid Mr. Grant approximately $6,500 per load of marijuana and $13,000 per load of cocaine that was loaded or unloaded at Hi-Tech; in total, he used Hi-Tech 30 or 40 times to unload marijuana and cocaine.  He notified Mr. Grant, by telephone, when trucks carrying drugs were en route to Hi-Tech and Mr. Grant routinely went to his shop to open the gate and allow the trucks to enter his property.

Mr. Burton also testified that Mr. Grant required the trucks to arrive in the dark and helped clear the way for the trucks to back up to the main building to

---

[3] Mr. Herrera pled guilty to a narcotics charge and was sentenced to 46 months' imprisonment.

unload.  Mr. Grant was thin and able to crawl inside the truck across the legitimate load, often fruit or produce, to unload the marijuana bales.  If necessary, Mr. Grant would drive the forklift to remove the legitimate load and locate the marijuana.  After unpacking the marijuana bales, he burned the packaging at his shop.

At the government's request, the district court gave the Eleventh Circuit pattern instruction on deliberate ignorance.  Mr. Grant objected, arguing that it was improper to give the deliberate ignorance instruction because there was no evidence of such conduct in the case.  *See id.* at 521-22, 600.  He did not object to the language of the deliberate ignorance charge as an incorrect statement of the law.

After the jury found him guilty, Mr. Grant moved for a new trial, re-asserting his challenge to the wiretap evidence, but the district court denied his motion.  The district court noted that it had once again reviewed the report and recommendation, the wiretap application, and the affidavit and concluded that there was "an overabundance of probable cause" to support the wiretap, even excising Mr. Lumsden's information.  *See* Transcript of Motion for New Trial and Sentencing [D.E. 380] at 2, 5-6.  The district court ultimately sentenced Mr. Grant to a term of imprisonment of 108 months.  *See id.* at 41.

## II. STANDARDS OF REVIEW

We review the district court's denial of a motion to suppress evidence under a mixed standard of review. *United States v. Jiminez*, 224 F.3d 1243, 1247 (11th Cir. 2000). "A district court's denial of a motion to suppress evidence is reviewed as a mixed question of law and fact, with the rulings of law reviewed *de novo* and the findings of fact reviewed for clear error, in the light most favorable to the prevailing party." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1213 (11th Cir. 2010). An application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant. *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990). The district court must "make a practical, common sense decision about whether the totality of the circumstances indicate that there is probable cause that the sought-for evidence will be obtained." *Id.* (internal quotation marks omitted). Our review of the district court's determination is to ensure that there was a "substantial basis" for concluding that probable cause existed. *Id.*

Probable cause for a wiretap must exist at the time the surveillance is authorized. *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985). Warrant applications based on stale information fail to create probable cause that improper conduct is continuing. *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994). Nevertheless, when criminal activity is "protracted and continuous," it is more likely that passage of time will not dissipate probable cause; it is reasonable to

8

assume that the activity has continued beyond last dates mentioned and may still be continuing. *Domme*, 753 F.2d at 953. "Time becomes less significant in the wiretap context, because the evidence sought to be seized is not a tangible object easily destroyed or removed," so "the stale information issue should be construed less rigorously." *Id. See also United States v. Hyde*, 574 F.2d 856, 865 (5th Cir. 1978) (staleness issue must be examined more liberally when a continuing pattern of criminal activity is alleged; such a "result is even more defensible in wiretap cases than in ordinary search warrant cases"). When reviewing staleness claims we do not apply a talismanic rule which establishes arbitrary time limitations; rather, we review each case based on the unique facts presented. *Harris*, 20 F.3d at 450. "[E]ven stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material." *Id.*; *Jiminez*, 224 F.3d at 1249.

"We apply a deferential standard of review to a trial court's jury instructions." *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008) (quoting *United States v. Puche*, 350 F.3d 1137, 1148 (11th Cir. 2003)). Under this standard, we will only reverse if we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations. *Id.* However, we review jury instructions *de novo* to determine whether they misstated the law or misled the jury to the prejudice of the objecting party. *United States v. Richardson*, 233 F.3d 1285, 1292 (11th Cir. 2000). The district court has broad

9

discretion in formulating a jury charge so long as the charge as a whole is a correct statement of the law. *Id.*; *United States v. Schlei*, 122 F.3d 944, 969 (11th Cir. 1997). We will not reverse a conviction unless we find that issues of law were presented inaccurately or the charge improperly guided the jury in such a substantial way as to violate due process. *United States v. Perez-Tosta*, 36 F.3d 1552, 1564 (11th Cir. 1994).

Jury instructions that are challenged for the first time on appeal are reviewed for plain error. *United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir. 1995). Under the "plain error" standard, a defendant must demonstrate that (1) an error occurred, (2) the error was plain, and (3) the error affected substantial rights; if these conditions are met, we may exercise our discretion to correct a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Felts*, 579 F.3d 1341, 1344 (11th Cir. 2009); *United States v. Evans*, 478 F.3d 1332, 1338 (11th Cir. 2007).

## III. DISCUSSION

### A. Motion to Suppress

First, Mr. Grant argues that the magistrate judge should have granted his motion to suppress the wiretap evidence because the affidavit knowingly contained material misrepresentations and omissions in violation of *Franks*. Second, he contends that once the alleged falsehoods are excised, no probable cause remains

for the wiretap. He asserts that the information provided by CW-1 was stale and that the evidence provided by CW-1 and the undercover agent only showed that Mr. Burton was trying to get back into the cocaine trafficking business, so that his comments amounted only to mere puffery. We disagree.

### 1. Probable Cause

We need not determine whether there was a violation under *Franks* because even if we excise the information obtained from Mr. Lumsden, the remaining portions of Agent Badolato's affidavit contained sufficient information to establish probable cause. *See United States v. Novaton*, 271 F.3d 968, 988 (11th Cir. 2001) ("in light of the other facts contained in the affidavits, the alleged omissions [pursuant to *Franks*] were immaterial to a finding of probable cause for the wiretaps"). The facts discussed above—namely, the investigation by the FBI, the consensually recorded telephone calls between CW-1 and Mr. Burton, and the statements of CW-1 and the undercover agent—provided sufficient probable cause to believe that evidence of Mr. Burton's drug trafficking would be intercepted. *See Nixon*, 918 F.2d at 900 (holding that wiretap authorization and its extension were supported by probable cause where defendants agreed to sell narcotics to undercover agents, confidential informant purchased cocaine, pen register activities indicated phone calls to known drug dealers, and surveillance and investigate reports suggested narcotics-related activity).

11

## 2. Staleness of Information Supporting Probable Cause

Mr. Grant asserts that CW-1's information was stale because his last drug deal with Mr. Burton was in 2003. Although information that is five years old is, without more, undoubtedly stale,[4] the affidavit here demonstrated past "protracted and continuous" drug trafficking activity as well as recent drug trafficking activity between CW-1 and Mr. Burton just before the application for the wiretap. *See Domme*, 753 F.2d at 953. The affidavit did not rely only on past drug deals; it related that, during his July 2008 meeting with CW-1 and the undercover agent, Mr. Burton discussed his intention of clearing his past drug debt so he could become the sole cocaine distributor in Atlanta, negotiated the price of cocaine, made calls to acquire secluded properties for the narcotics operation, and showed possible stash houses to be used for the operation. *See Harris*, 20 F.3d at 451 ("Because the affidavit alleged ongoing activity and a continuing relationship between coconspirators, the information was not fatally stale."); *Domme*, 753 F.2d at 955 ("In light of the less rigorous treatment accorded the stale information issue . . . the facts presented were sufficient to form a reasonable belief that the activities were continuing, despite the gap in time").

---

[4] *See* Transcript of *Franks* Hearing at 51 (Agent Badolato testifies that "the last drug deals that took place between CW-1 and Marlon Burton were back in 2003"); *id.* at 52 (Agent Badolato does not dispute that such information is five years old).

Moreover, toll records from August 17 to November 13, 2008, showed that Mr. Burton contacted known Mexican drug traffickers on multiple occasions. *See* Affidavit at ¶¶ 33-37. For example, Mr. Burton had been in contact with Mr. Duron, who directs supplies of cocaine from Mexico, on 33 occasions, with the last actual contact on November 7, 2008 (a few weeks before the affidavit was signed). *See id.* at ¶ 35. These toll records, along with the meetings and recorded calls in July and October 2008, sufficiently corroborated the possibly stale information. *See United States v. Green*, 40 F.3d 1167, 1172 (11th Cir. 1994) (holding that information from confidential informant regarding the recent continued sale of cocaine served as an update of previously obtained information which was unspecific about time and was therefore not stale). *See also Jiminez*, 224 F.3d at 1249; *Harris*, 20 F.3d at 451.

As the wiretap authorization was supported by probable cause and the information in the affidavit was not stale, we affirm the district court's denial of Mr. Grant's motion to suppress.

## B. Jury Instructions

### 1. The Deliberate Ignorance Instruction

We have held that a deliberate ignorance instruction is appropriate "only when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid

13

learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir. 1991) (quotation and alteration omitted). A district court should not instruct the jury on deliberate ignorance when the relevant evidence points only to actual knowledge, rather than deliberate avoidance. *Id.* Improperly instructing the jury on deliberate ignorance, however, is harmless error where the jury was also instructed and could have convicted on an alternative, sufficiently supported theory of actual knowledge. *See United States v. Kennard*, 472 F.3d 851, 858 (11th Cir. 2006); *United States v. Perez–Tosta*, 36 F.3d 1552, 1564 (11th Cir. 1994); *United States v. Stone*, 9 F.3d 934, 937, 942 (11th Cir. 1993); *Rivera*, 944 F.2d at 1572.

As noted earlier, Mr. Grant argues that the deliberate ignorance instruction was improper because there was no evidence to support a theory of deliberate ignorance. The government argues that there was evidence of both actual knowledge and deliberate ignorance of drug trafficking activity. We need not decide whether the evidence at trial supported a deliberate ignorance instruction.

Even assuming there was no evidence that Mr. Grant was deliberately ignorant and for that reason the instruction should not have been given, the instruction constituted harmless error because there was sufficient evidence to prove that Mr. Grant had actual knowledge. *See United States v. Steed*, 548 F.3d 961, 978 (11th Cir. 2008) (declining to address whether the facts at trial supported

14

a deliberate ignorance instruction because any shortcoming in the evidence about deliberate ignorance was rendered harmless by the sufficiency of the evidence of actual knowledge); *Kennard*, 472 F.3d at 858 (same). The testimony of Messrs. Burton and Herrera—discussed above—established that Mr. Grant actually knew that the trucks were unloading marijuana at Hi-Tech. Specifically, Mr. Burton testified that Mr. Grant often cleared the way for the trucks, participated in unloading the marijuana by crawling inside the trucks or using a forklift to remove the legitimate load and locate the marijuana, unpackaged the marijuana bales, and burned the packaging at Hi-Tech. Mr. Burton also testified that he paid Mr. Grant approximately $6,500 per load of marijuana and $13,000 per load of cocaine.

This evidence was sufficient for a jury to conclude that Mr. Grant had actual knowledge of the marijuana in the trucks. We therefore conclude that any error with respect to the deliberate ignorance instruction was harmless.

## 2. The Wording of the Deliberate Ignorance Instruction

Finally, Mr. Grant argues that the deliberate ignorance instruction, based on the Eleventh Circuit pattern jury instructions, was erroneous because it misstated the law in light of the Supreme Court's decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011). Although Mr. Grant objected to giving any deliberate ignorance instruction at trial, he did not challenge the wording of the

15

instruction that was given.  Because no objection was made at trial, we review this particular claim for plain error.

Contrary to Mr. Grant's contention, the Eleventh Circuit pattern jury instruction on deliberate ignorance is not inconsistent with the standard laid out in *Global-Tech*.  *Compare Global-Tech*, 131 S. Ct. at 2069-71 (holding that the doctrine of willful blindness, well established in criminal law and embraced by federal courts of appeals, applies to civil lawsuits for induced patent infringement), *with* Eleventh Circuit Pattern Jury Instruction, Special Instruction No. 8 (2010).[5] In fact, the Supreme Court in *Global-Tech* specifically cited to the Eleventh Circuit's deliberate ignorance instruction in *Perez-Tosta* as illustrative of the deliberate ignorance standard.  *See Global-Tech*, 131 S. Ct. at 2070 n. 9.  The instruction in *Perez-Tosta* matched almost verbatim the instruction used in Mr.

---

[5] Special Instruction No. 8 provides:

Deliberate Ignorance as Proof of Knowledge

If a Defendant's knowledge of a fact is an essential part of a crime, it's enough that the Defendant was aware of a high probability that the fact existed – unless the Defendant actually believed the fact didn't exist.

"Deliberate avoidance of positive knowledge" – which is the equivalent of knowledge – occurs, for example, if a defendant possesses a package and believes it contains a controlled substance but deliberately avoids learning that it contains the controlled substance so he or she can deny knowledge of the package's contents.

So you may find that a defendant knew about the possession of a controlled substance if you determine beyond a reasonable doubt that the defendant (1) actually knew about the controlled substance, or (2) had every reason to know but deliberately closed [his] [her] eyes.

But I must emphasize that negligence, carelessness, or foolishness isn't enough to prove that the Defendant knew about the possession of the controlled substance.

The district court's instruction matches this language verbatim.  *See* Trial Transcript at 594.

Grant's case.  *Compare Perez-Tosta*, 36 F.3d at 1564 n.13, *with* Trial Transcript at 594.  Under these circumstances, we find no plain error.

## IV. CONCLUSION

The district court properly denied Mr. Grant's motion to suppress the wiretap evidence because Agent Badolato's affidavit—even without the information provided by Mr. Lumsden—was supported by probable cause and did not merely contain stale information.  The district court did not plainly err in using the Eleventh Circuit pattern jury instruction on deliberate ignorance and any error in giving that instruction was harmless.  Accordingly, we affirm.

**AFFIRMED.**

17