[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14881
Non-Argument Calendar

_____

D. C. Docket No. 05-00527-CR-T-23MAP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRYAN TIMOTHYLEENARD SMITH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(November 13, 2007)**

Before ANDERSON, BARKETT and MARCUS, Circuit Judges.

PER CURIAM:

Bryan Timothyleenard Smith appeals his convictions, after a jury trial, for

conspiracy to obstruct commerce, a violation of 18 U.S.C. §§ 1951, 2; obstruction

and attempted obstruction of commerce by robbery, a violation of 18 U.S.C. §§

1951, 2; and carrying a firearm, which was discharged and brandished during a crime of violence, a violation of 18 U.S.C. §§ 924(c)(1)(A), (c)(1)(A)(iii), (2). Smith also challenges his sentence of 140 years' imprisonment. On appeal, Smith argues the evidence was insufficient to support his convictions, and also claims that the district court improperly determined the Sentencing Guidelines range and imposed an unreasonable sentence.[1]   After careful review, we affirm.

## I.

We review challenges to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the jury's verdict and drawing all reasonable inferences in favor of the verdict. United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005), cert. denied 547 U.S. 1047 (2006). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or

---

[1]  Additionally, Smith argues that the district court's factual determinations at sentencing, made by a preponderance of the evidence, violated his Sixth Amendment right to a jury trial. This argument is foreclosed by our decision in United States v. Chau, 426 F.3d 1318, 1323-24 (11th Cir. 2005). We also will not review Smith's ineffective-assistance-of-counsel claim, made for the first time on direct appeal, given the insufficiency of the record. See United States v. Verbitskaya, 406 F.3d 1324, 1337 (11th Cir. 2005) ("Except in the rare instance when the record is sufficiently developed, we will not address claims for ineffective assistance of counsel on direct appeal."), cert. denied, 126 S. Ct. 1095 (2006). As for Smith's request to overturn the Supreme Court's decision in Deal v. United States, 508 U.S. 129, (1993), it is well-settled that we are powerless to do that and are bound to follow Supreme Court precedent. United States v. Greer, 440 F.3d 1267, 1275-76 (11th Cir. 2006); United States v. Gibson, 434 F.3d 1234, 1246-47 (11th Cir. 2006). Finally, we are unpersuaded by Smith's suggestion that his sentence, which exceeded neither the statutory range nor the Guidelines range, violates the Eighth Amendment to the Constitution as cruel and unusual punishment. Cf. United States v. Moriarty, 429 F.3d 1012, 1024 (11th Cir. 2005) ("In general, a sentence imposed within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment.").

be wholly inconsistent with every conclusion except that of guilt," United States v. Harris, 20 F.3d 445, 453 (11th Cir. 1994), because "[a] jury is free to choose among reasonable constructions of the evidence," United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983). To the extent that some of Smith's sufficiency challenges were not raised below -- in moving for a judgment of acquittal, Smith did not argue that the evidence failed to establish the requisite interstate commerce nexus -- our review is for plain error. See United States v. Bichsel, 156 F.3d 1148, 1150 (11th Cir. 1998). Plain error is only found where: (1) there is an error; (2) the error is obvious; (3) the error affects the defendant's substantial rights; and (4) the error "seriously affects the fairness, integrity, or public reputation of a judicial proceeding." United States v. Olano, 507 U.S. 725, 732 (1993).

The standards of review for Smith's sentencing claims are straightforward. We accept a district court's factual findings under the Guidelines, unless those findings are clearly erroneous. United States v. Jordi, 418 F.3d 1212, 1214 (11th Cir. 2005). We deferentially review the final sentence imposed by the district court for reasonableness. United States v. Winingear, 422 F.3d 1241, 1245 (11th Cir. 2005). Even so, we do not presume reasonable a sentence within the properly calculated Guidelines range. See United States v. Hunt, 459 F.3d 1180, 1185 (11th

Cir. 2006). However, we ordinarily expect a sentence within the guideline range to be reasonable. United States v. Talley, 431 F.3d 784, 787-88 (11th Cir. 2005).

## II.

The relevant facts are these. On February 22, 2006, in a superseding indictment, Smith and Jamail Hogan, who is Smith's half-brother, were charged with: (1) conspiring to obstruct commerce by robbery, in violation of 18 U.S.C. §§ 1951 and 2 (Count One); (2) carjacking with serious bodily injury, in violation of 18 U.S.C. §§ 2119, 2119(2) and 2 (Count Two); (3) three counts of carrying and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(A)(ii), and 2 (Counts Three, Eight, and Ten); (4) three counts of obstructing commerce by robbery, in violation of 18 U.S.C. §§ 1951 and 2 (Counts Four, Six, and Nine); (5) three counts of carrying and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(A)(iii), and 2 (Counts Five, Seven, and Twelve); and (6) attempting to obstruct commerce by robbery, in violation of 18 U.S.C. §§ 1951 and 2 (Count Eleven). Smith pled not guilty to all charges and proceeded to a jury trial.[2]

---

[2] After the district court granted the co-defendants' motion to sever trial, Hogan also proceeded to a separate jury trial, after which he was sentenced to a total term of imprisonment of 242 years.

4

At trial, Smith made no opening statement and presented no evidence, instead choosing to assert his theory of defense -- that although he drove the getaway car to some of the armed robberies, he remained in the car and did not know that his two companions were robbing the stores -- solely through cross-examination of three of the government's eighteen witnesses.

The government presented the following evidence. In the evening of November 26, 2005, around 5:00 p.m., Mark Baron was visiting a friend at the Sunshine Motel in Winter Haven, Florida, when Hogan and another man, both wearing bandanas and hats to conceal their faces, kicked in the door to the motel room. One of the men hit Baron twice in the head with a handgun and demanded the keys to Baron's truck, which was parked just outside. Baron threw the keys to the man and ran from the hotel. As he ran away, he heard a gunshot.

A few hours later, at approximately 8:00 p.m., Hogan and the other man, both again wearing bandanas and gloves, robbed the Speedy Food Mart, which was right down the road from the Sunshine Hotel in Winter Haven, at gunpoint. The store clerk, Suvi Cyriac, testified that when the robbers approached the store, he was outside talking to some regular customers. Cyriac saw two masked people, both of whom were wearing gloves, coming toward him, one of whom had a gun. One of the men hit the store clerk, Suvi Cyriac, in the face, fracturing his jaw, and

5

shot at him when he had difficulty opening the register. Because one of the robbers had tried to force the register open, it was jammed and Cyriac was unable to open it. Instead, Cyriac gave the robbers some boxes with rolled coins and banded currency, totaling about $1000 to $2000. Cyriac had three fractures to his jaw, and his mouth had to be wired shut for two months after the robbery. The government presented the store's surveillance camera photos of the robbery.

On the following night, at approximately 9:55 p.m., Hogan and another man entered the Island Foods convenience store in Haines City, Florida, and robbed the store at gunpoint. The perpetrators were wearing hooded coats and gloves. The government presented surveillance photos of the robbery. Before leaving with $50 from the cash register, one of the men fired a shot into the floor of the store.

On that same night, at 10:30 p.m., about fifteen miles from Haines City, Hogan and the other man robbed a Circle K convenience store, again wearing gloves and at gunpoint. This incident was recorded on a surveillance camera video, which was presented to the jury. Crime scene technicians successfully lifted a shoeprint from the counter over which the perpetrators had jumped.

About five days later, on December 2, 2005, at approximately 12:15 p.m., Hogan told his supervisor at Homes of Merit home manufacturing plant that he needed to leave work early. After Hogan clocked out, the supervisor saw him walk

out of the plant toward a white car waiting to pick him up. At approximately 2:00 p.m., Hogan and another person, both wearing bandanas to conceal their faces, attempted to rob Bill's Market convenience store, which is about one block away from Homes of Merit. One of the perpetrators carried a gun and the other had a club or a baton. The attempted robbery was caught on tape. Although Hogan and the other perpetrator had covered their faces, Raj Bhasakran, one of the store clerks, recognized Hogan, as he was a frequent customer. Hogan shot the other clerk, Remesh Desai, through the chest with a .380-caliber round, and then fled the store, without any money. Three weeks later, Desai died.

The government presented the testimony of four eyewitnesses who were in the parking lot or in the store next to Bill's Market. These witnesses consistently testified that they saw two perpetrators, one of whom was carrying a gun and the other a club or a board or a baton, exit Bill's Market and run to a white Chevy Cavalier. The witnesses all testified that they saw nobody else near the Cavalier. The perpetrator with the gun got into the driver's seat, and the other one got into the passenger's side of the vehicle. Less than two hours after the robbery, a crime scene investigator recovered shoe impressions from the sandy area in front of the store.

7

That night, Polk County Sheriff's Office deputies stopped and arrested Hogan after one deputy observed him speeding down the highway in the white Cavalier. During a search of the Cavalier, deputies found a .380-caliber handgun lying on the back seat; nine live, .380-caliber bullets; a black, side-handle baton; a red, hooded sweatshirt; a ski mask; a camouflage glove; a pair of jean shorts; and a black bandana. Deputies also found two live rounds of ammunition and a black "do rag" on Hogan's person, and seized sneakers and a "Dirty South" sweatshirt, which Hogan had been wearing when arrested. The soles of Hogan's sneakers matched one of the shoe impressions taken from Bill's Market. A .380-caliber shell casing recovered from the Sunshine Motel, a projectile recovered from the Island Foods Store, and a spent casing and projectile recovered from Bill's Market all had been fired from the handgun taken from the Cavalier.

During a search of Hogan's residence a few hours later, law enforcement agents found more .380-caliber ammunition, another camouflage glove, a blue latex glove, one white and one cream ski cap, a white "do rag," a white baseball cap, another "Dirty South" sweatshirt, and two pairs of sneakers. Agents also found Mark Baron's set of keys to his truck, his business card holder, and the hands-free earphone for his cellular telephone, which had been in his truck. The soles of one pair of sneakers found in Hogan's residence matched one of the shoe

impressions taken from the Circle K and one taken from Bill's Market. The soles of the other seized sneakers matched shoeprints taken from the Speedy Food Mart.

While being interviewed by law enforcement agents after his arrest, Hogan received a call from Smith on his cellular telephone. One of the interviewing agents, Detective Edwin Moran of the Polk County Sheriff's Office, answered Hogan's cell phone and asked Smith to come to the Polk County Sheriff's Office, ostensibly to pick up the white Cavalier. In fact, Detective Moran testified, since the Cavalier matched the description of the vehicle at Bill's Market earlier that day and was registered in Smith's name, Moran wanted to question Smith about the robberies.

After he arrived and was advised of his rights, Smith first acknowledged that the car was his, and when he was informed that a gun had been found in the car, he responded that the gun belonged to his brother. Smith also recounted his actions earlier during the day, initially denying that he was at Bill's Market, despite that Detective Moran had told Smith that he (Moran) was investigating an incident at Bill's Market. When Moran told Smith that witnesses had seen his car parked on a dirt road next to Bill's Market, Smith recanted his original story and stated that he had driven Hogan and another man to Bill's Market. Smith claimed that he had stood next to the vehicle while Hogan and the other man went into the store. Smith

9

told agents that Hogan and the other man subsequently came running out of the store and had jumped into the car. Smith said that he did not realize anything was wrong until one of the store employees came running out of the store. Moran also asked Smith about the other items found in the Cavalier, including a red "Dirty South" sweatshirt. Smith claimed that he had loaned it to the unknown man who had gone into Bill's Market with Hogan. Smith further stated that the baton or club found in the Cavalier was his father's and that he had taken the baton from the garage of his house and put it in his car sometime during the previous week.

Smith further stated that he had driven Hogan and another man he knew as "Pooky" to the Speedy Food Mart robbery on November 26th, and the November 27th robberies at the Circle K and the Island Foods Store. Again, Smith claimed that he had not participated in any of the robberies. He said during all of the armed robberies, he had remained in the car and had not known that the robberies were taking place.

At the end of the government's case-in-chief, Smith moved for a judgment of acquittal based on numerous grounds, including that the government had presented no evidence linking him to the Sunshine Motel carjacking, or placing him inside of any of the stores during the robberies. According to Smith's argument, the government's evidence showed only that an unidentified person had

committed the robberies with Hogan.  As for Smith's statement to law enforcement that he had driven Hogan to the sites of the robberies, Smith contended that the statement was insufficient to allow the jury to infer intent to commit the charged crimes.  The district court overruled Smith's motion.

Smith rested without presenting any evidence.  The jury found Smith guilty of Counts One, Six, Seven, Nine, Ten, Eleven and Twelve, all of which related to the robberies at the Island Foods Store and Circle K on November 27th and at Bill's Market on December 2nd.  The jury found Smith not guilty of Counts Two, Three, Four, Five, and Eight, all of which related to the incidents on November 26th -- the carjacking at the Sunshine Motel and the robbery at the Speedy Food Mart.  He then proceeded to sentencing.

The presentence investigation report ("PSI") first noted the applicable mandatory minimums, which included 10 years as to Count Seven and 25 years as to Counts Ten and Twelve, with the sentences for each count to run consecutively.  The PSI then separated some of Smith's convictions into groups for purposes of calculating the Guidelines range.  The first group included Counts One and Six, both of which related to the Island Foods Store robbery.  The second group included Counts One and Nine, both of which related to the robbery of Circle K.  The third group related to the attempted robbery of Bill's Market and included

Counts One and Eleven. The PSI stated that, according to the medical examiner, Desai died as a result of the gun shot wound he suffered during the robbery of Bill's Market. Pursuant to U.S.S.G. § 3D1.1(b)(1), Counts Seven, Ten, and Twelve, which all involved the use of firearms, were not grouped.

The PSI computed a base offense level of 20, pursuant to U.S.S.G. § 2B3.1, for groups one and two, and a base offense level of 43, pursuant to §§ 2A1.1(a), 2B3.1(c)(1), for group three, due in large part to Desai's death. The PSI stated that Smith had no prior convictions and recommended a criminal history category I. Smith faced an advisory Guidelines range of <u>life</u> imprisonment, but the PSI noted that after taking account of the applicable statutory maximums, the total Guidelines range was 140 years' imprisonment. Finally, the PSI noted that Smith was 20 years old, had been attending college, and had no history of alcohol or illicit substance abuse. Neither party filed objections to the PSI. Moreover, at sentencing, Smith did not object to the factual statements or the recommended Guidelines range.

The district court adopted the PSI's application of the Guidelines and then heard mitigating and aggravating evidence. The district court invited victims in attendance to speak and Hiren Desai, Desai's son, requested justice for his father's death. Next, Smith's mother apologized to the victims and requested mercy.

12

Smith's step-father stated that Smith was a good kid and requested leniency. Smith's father stated that Smith was a wonderful and respectful son, who unknowingly became involved in the crimes, and requested mercy. The district court also accepted letters from Smith's college professors, his high school counselor, and a senior home where he had volunteered. Finally, Smith made a statement on his own behalf. He explained that he was not a "violent monster" and that he was just helping Hogan by giving him a ride. Smith stated that he sympathized with the victims.

Defense counsel argued that a 140-year term was unwarranted and would be especially devastating and leave no hope, in light of Smith's age and the fact that he had no prior criminal record. Recognizing that 18 U.S.C. § 924 required a minimum sentence of 60 consecutive years for Counts Seven, Ten, and Twelve, Smith requested that the district court exercise its discretion to impose a below-Guidelines sentence, as to the remaining counts (One, Six, Nine, and Eleven), for which he faced an advisory range of 80 years. Smith reiterated his positive contributions to society and family support. The government objected to a below-Guidelines sentence.

The district court recognized that nothing in Smith's background would have predicted his involvement in charged crimes, and the court characterized Smith as

mild and unaggressive. The court also opined that Hogan was more aggressive and was the leader. After stating that it had considered the § 3553 factors and had accorded advisory consideration to the Guidelines range, the district court sentenced Smith to a total term of 1,680 months' incarceration, which represented the following consecutive sentences: the statutory maximum of 240 months for each of Counts One, Six, Nine, and Eleven; the statutory minimum of 120 months' for Count Seven; and the statutory minimum of 300 months for each of Counts Ten and Twelve. Neither party objected to the sentence or the manner in which it was announced. This appeal followed.

**III.**

First, Smith challenges the sufficiency of the evidence to support his convictions. He argues that the only evidence connecting him to the crimes was his statement to law enforcement that he had driven Hogan and an unknown person to and from the scenes of the three armed robberies for which the jury found him guilty. Smith contends that his "mere presence" at the crime scenes cannot support the conspiracy convictions. Although Smith cites United States v. Gray, 260 F.3d 1267 (11th Cir. 2001), and acknowledges that "the law . . . is clear that only a minimal effect upon commerce is necessary to form the interstate commerce nexus required under the Hobbs Act" to invoke federal jurisdiction through the

14

Commerce Clause, he also argues, for the first time on appeal, that the robberies lacked the requisite interstate commerce nexus without citation to supporting authority.

Section 2 of Title 18 of the United States Code provides that whoever aids or abets the commission of an offense against the United States, including violations of 18 U.S.C. §§ 1951, 924, is punishable as a principal to the offense. See 18 U.S.C. § 2. In order to support a conviction for conspiracy under § 2, the government must prove knowing participation and an agreement. United States v. Lyons, 53 F.3d 1198, 1201 (11th Cir. 1995). "Mere presence, guilty knowledge, even sympathetic observation" are insufficient to support a conviction for conspiracy. Id. Although mere presence is inadequate to establish guilt, "we have held that 'it is material, highly probative, and not to be discounted.'" United States v. Gamboa, 166 F.3d 1327, 1332 (11th Cir. 1999) (citation omitted). Moreover, "a jury may find knowledgeable voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." United States v. Cruz-Valdez, 773 F.2d 1541, 1546 (11th Cir. 1985) (en banc).

Section 1951 of Title 18 of the United States Code, part of the Hobbs Act, requires the government to prove beyond a reasonable doubt that a defendant

15

obstructed or affected interstate commerce by robbery, conspired to do so, or threatened or committed physical violence to any person or property in furtherance of the robbery or conspiracy. 18 U.S.C. § 1951. We have specifically held that robbery "is undeniably an economic crime," whose relationship to "commerce is clear, direct, and unattentuated." United States v. Gray, 260 F.3d at 1267, 1274 (11th Cir. 2001). The type of evidence required for the Government to satisfy its burden of proof concerning the interstate commerce nexus under the Hobbs Act differs depending on whether the defendant is charged with inchoate offenses of conspiracy and attempt, on one hand, or a substantive offense. United States v. Le, 256 F.3d 1229, 1232 (11th Cir. 2001). Where a defendant is charged with attempt or conspiracy to violate the Hobbs Act, "the interstate nexus may be demonstrated by evidence of potential impact on interstate commerce or by evidence of actual, de minimis impact." Id. (citations omitted). In the case of a substantive Hobbs Act offense, the "impact on commerce does not need to be substantial; all that is required is minimal impact." Id.

Section 924(c) requires the government to prove beyond a reasonable doubt that a defendant carried, brandished, or discharged a firearm during a crime of violence. 18 U.S.C. § 924(c)(1)(A). A defendant may be criminally liable under § 924, if he could reasonably foresee that his co-conspirator would use or carry a

16

firearm in connection with a crime of violence. <u>United States v. Bell</u>, 137 F.3d 1274, 1275 (11th Cir. 1998).

We first consider the sufficiency of the evidence to support Smith's convictions for the armed robberies at the Circle K and the Islands Food Store on November 27th and at Bill's Market on December 2nd. In his statement to Detective Moran, Smith <u>admitted</u> to being present, as the driver, at these three armed robberies. Notably, the car observed outside of Bill's Market, in which the two perpetrators fled the scene, was registered to Smith.

The two robberies on November 27th occurred a mere 35 minutes apart. During this short time span, according to Smith's story, he drove his brother and someone he knew only as "Pooky" to two convenience stores, but remained outside and did not know that anything unusual was taking place inside of the stores, despite that the perpetrators of both of these crimes wore masks, or otherwise concealed their faces, and gloves. The jury readily could have inferred that it would not be reasonable for Smith, even if present at these crimes solely as the getaway driver, to have had no idea that a crime had been committed, in light of the disguises the perpetrators must have been wearing when they exited the Cavalier and entered the stores.

17

As for the Bill's Market incident, which resulted in Desai's death, at first, Smith claimed he was not at Bill's Market earlier in the day. Only after Detective Moran told him that his car had been seen outside of the Market did Smith recant his initial claim and then suggest that, in fact, he was present but had remained outside, standing by the car. Notably, the four eyewitnesses who saw the two perpetrators fleeing Bill's Market, one with a gun and the other with a club or baton, consistently said that they saw nobody else in the area around the car. Moreover, the witnesses all said that they saw the perpetrator with the gun sit in the driver's seat, thus undermining Smith's suggestion that he was the driver and had remained outside of the store while Hogan and an unknown person committed the crime. Smith also admitted to Moran that one of the sweatshirts found in the Cavalier, and worn by one of the perpetrators of the Bill's Market robbery, belonged to him. And, again, during this robbery the perpetrators wore masks, or otherwise concealed their faces, and gloves. Finally, Smith said that the baton carried during the Bill's Market robbery, in fact, belonged to his father. Smith said that he had put the baton in his car sometime during the prior week. Given all of these circumstances, a reasonable jury could have found Smith guilty, beyond a reasonable doubt, either as one of the perpetrators who went into the store, or as an aider and abettor.

18

On this record, a reasonable jury could have found, beyond a reasonable doubt, that Smith's participation was instrumental in the perpetration of the armed robberies, and thus the jury also could reasonably infer his participation in the conspiracy and conclude that he committed the conspiracy offenses. The jury readily could have chosen to reject Smith's theory of defense, which, again, was that he remained in the car during the robberies and did not know what was happening inside the stores. Indeed, the jury's split verdict indicates that it followed the district court's instructions and carefully considered each count individually and its related evidence. In fact, the record fully supports the jury's verdict on two theories. First, Smith committed the robberies with Hogan, and his suggestion that "Pooky" was present on November 27th and another unknown person accompanied Hogan into Bill's Market on December 2nd was fabricated. Alternatively, even if "Pooky" and the unknown other perpetrator existed, Smith was a knowing participant, by his own admission, as the getaway driver.

As for the charges for carrying a firearm, which was brandished or used during a crime of violence, during his interview with Detective Moran, Smith admitted to driving Hogan to and from each of the armed robberies for which he was convicted <u>and</u> that he was aware that his brother had a gun. The jury could reasonably conclude that Smith, at the very least, saw the firearm when driving

Hogan to and from the multiple crime scenes and that it was reasonably foreseeable the firearm would be used during the robberies. Moreover, the government presented abundant evidence that each store robbed was engaged in interstate commerce and, thus, that each act had at least a de minimis, actual impact sufficient to establish the required interstate commerce nexus. In short, Smith has not shown reversible error based on the sufficiency of the evidence.

**IV.**

We likewise are unpersuaded by Smith's sentencing claims. First, we find no error in the calculation of the advisory Guidelines range. Where a defendant does not object to statements in the PSI, the district court may rely on those undisputed statements, even in the absence of supporting evidence. See United States v. Hedges, 175 F.3d 1312, 1315 (11th Cir. 1999). Pursuant to U.S.S.G. §§ 2A1.1(a), 2B3.1(c), an offense level of 43 is applied if a victim is killed under circumstances that would constitute murder under 18 U.S.C. § 1111. Section 1111, in turn, defines murder as "the unlawful killing of a human being with malice aforethought. Every murder . . . committed in the perpetration of, or attempt to perpetrate, any . . . robbery . . . is murder in the first degree." 18 U.S.C. § 1111. Given the PSI's undisputed factual finding that Desai died as a result of the gunshot wound he received in the course of the Bill's Market robbery, we discern

no error in the assignment of an offense level of 43 or in the calculation of the advisory Guidelines range based on that offense level.

As for the reasonableness of Smith's ultimate sentence, we begin our analysis by observing that the sentence imposed was a low-end Guidelines sentence. Although we do not presume reasonable a sentence within the properly calculated Guidelines range, we ordinarily expect such a sentence to be reasonable. See United States v. Hunt, 459 F.3d 1180, 1185 (11th Cir. 2006); United States v. Talley, 431 F.3d 784, 787-88 (11th Cir. 2005).

When reviewing reasonableness, we consider the factors outlined in 18 U.S.C. § 3553(a) and the district court's reasons for imposing the particular sentence. United States v. Williams, 456 F.3d 1353, 1360-61 (11th Cir. 2006). The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training or medical care; (3) the kinds of sentences available; (4) the Sentencing Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to

21

avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1)-(7).

Before imposing sentence, the district court considered the PSI and the advisory Guidelines range, as well as mitigating statements from Smith's mother and step-father, Smith's own statement of remorse, and numerous letters in support of mitigation. The court stated that despite the mitigating evidence and Smith's lack of a criminal history, the court saw no reason to depart from the recommended range. On this record, Smith has not met his burden to establish his sentence was unreasonable.

**AFFIRMED**.