[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13809

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 26, 2008
THOMAS K. KAHN
CLERK

D.C. Docket No. 04-00010 CR-3-001-MCR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID W. SVETE,
RON GIRARDOT,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(March 26, 2008)**

Before DUBINA and KRAVITCH, Circuit Judges, and COOGLER,* District
Judge.

COOGLER, District Judge:

_____

* Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama,
sitting by designation.

After a six week jury trial, David W. Svete and Ron Girardot were convicted of conspiracy, mail fraud, money laundering, and interstate transportation of money obtained by fraud, all charges being related to their dealings with viaticals. They now appeal their convictions and present five issues for review. Perhaps the most significant issue is whether the current Eleventh Circuit pattern jury instruction for mail fraud, which omits the requirement of ordinary prudence by investors, is proper. The defendants also challenge the sufficiency of the evidence presented by the government and Svete alleges violations of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972) based on inconsistencies between the trial and sentencing testimony of a government witness. Finally, Svete raises two sentencing issues.

Because the jury instruction seriously impaired the defendants' ability to conduct their defense on the substantive counts of mail fraud, we reverse as to those counts. We affirm as to all other issues raised by the defendants.

I.     Background

A.     Procedural History

Svete and Girardot were charged in a superseding indictment with conspiracy to violate the laws of the United States in violation of 18 U.S.C. § 371 (Count One); conspiracy to launder money in violation of 18 U.S.C. § 1956(h) (Count Two); mail

fraud in violation of 18 U.S.C. § 1341 (Counts Three through Seven); and substantive violations of interstate transportation of money obtained by fraud in violation of 18 U.S.C. § 2314 (Counts Eight through Ten). The jury convicted Svete and Girardot of all counts. Thereafter, the district court sentenced Girardot to a term of imprisonment of 60 months as to Count One and 63 months as to Counts Two through Ten, to run concurrently with one another. In addition, Girardot was ordered to pay a special monetary assessment of $1,000, restitution in the amount of $100,722,605.34, and to serve a 3 year period of supervised release. Svete was sentenced to a term of imprisonment of 60 months as to Count One and 200 months as to Counts Two through Ten, to run concurrently with one another. Svete was also ordered to pay a special monetary assessment of $1,000, restitution in the amount of $100,722,605.34, a $21,000,000 forfeiture, and to serve a 3 year period of supervised release.

B.    Facts[1]

1.    Introduction

Viaticals are legitimate insurance products in all states, allowing patients ("viators") to sell the right to receive benefits under their life insurance policies for

------

[1] The facts as set forth herein have been considerably condensed from their original form to address only the issues presented by the appeal.

tax-free cash. The sale of viaticals is usually made to a provider company through a broker. The provider company, in turn, typically through a sales agent, finds independent purchasers to invest in the policies. Each purchaser (also referred to as "investor") buys the right to become a beneficiary of the viator's life insurance policy. Thereby, purchasers receive a high return on their investment if the viator dies within the time projected by the viatical settlement provider. However, investors risk a reduction of their return or a complete loss if the viator does not die within the time projected because the investor must continue to pay the premiums on the policy as they accrue or the policy will lapse.

Svete became involved with viaticals in 1997 when he incorporated LifeTime Capital, Inc. ("LCI") in Nevada as a provider company. He later incorporated Alexander Chase, d/b/a WSI, for the same purpose, as well as multiple additional businesses offering financial, office, marketing, and viatical services.[2] According to trial testimony, Svete's control of these corporations was secreted, thus misleading investors and providing an avenue to launder money taken by fraud.

Svete's right hand man was Ron Girardot. Girardot first became employed with Alexander Chase, Svete's financial advisory company, in 1997 as an operations

---

[2] Those businesses included: Pacific View Management, Inc.; Ocean View Holdings Limited Partnership; A.C. Group, Inc.; Sovereign Enterprises, Inc.; Dove Creative, Inc.; and Medical Underwriting, Inc. ("MUI").

engineer responsible for processes and procedures. In April 1998, Girardot became the temporary President of LCI. From LCI, Girardot moved to another of Svete's companies, Sovereign Enterprises, as Vice President of Operations. Finally, in November 1999, Girardot moved to Svete's Blue Crest, an investment servicing company, as President. As alleged by the government, Girardot's role was to aid in defrauding investors and to launder the money taken by fraud.

During the course of trial, the government presented evidence that defendants defrauded viatical investors by intentionally misrepresenting: (1) life expectancies of viators; (2) the status of the life insurance contracts; and (3) the risks associated with the purchase of certain viatical contracts. During the time Svete's companies were buying viaticals and selling investments, not less than $101,811,873.88 was invested by at least 3,125 investors. Of that group, at least 1,351 were investors over the age of 65.

## 2. Evidence of Fraudulent Misrepresentations

Thirty-five witnesses testified during the course of the trial that their investment failed to mature when anticipated. Those investors had been told or provided marketing materials stating that their investment policies concerned terminally ill patients as determined by independent medical specialists who had access to the viators' complete medical records and doctors. This was inaccurate on

5

many levels. Medical doctors were retained to review patient files and estimate life expectancies. However, complete medical records were not provided to those doctors. Instead, they only reviewed medical and laboratory summaries, and did not consult with the attending physicians. Some medical files were submitted for life expectancy review multiple times in an effort to shop for the life expectancy that matched the funded amount. Other times, viator information was never even presented to independent medical doctors for mortality reports. In those instances, Charme Austin, a medical underwriter for Svete, was instructed to create opinions on life expectancy herself and to forge the signatures of independent physicians on those mortality reports. At all times during this process, sales agents were prohibited from obtaining the actual medical information establishing life expectancies.

Additional evidence of fraud perpetuated on investors came in the form of testimony regarding altered contracts. Initial viatical settlement contracts reflected that the terminally ill status of the viator was determined by a physician's medical opinion. Nanette Zima,[3] who served as President and CEO of LCI for about one year,

_____

[3] Zima had concerns about the business of LCI. As of September of 1997, LCI did not have enough viaticals to assign to the funds investors had given to invest because the policies were too expensive. Sometime after September, Svete directed Zima to alter the established life expectancies on the marketing materials to make them more attractive.

6

testified that she was instructed by Svete to, along with Ron Girardot,[4] alter pre-existing investor agreements to remove the terms "terminally ill" and "by a physician" without the knowledge or consent of investors.

Finally, investors were told that an independent investment servicing company maintained a premium reserve account for the purpose of underwriting the policies. In fact, the company was created and controlled[5] by Svete and lacked sufficient funds to pay premiums on purchased policies as they came due for one year past the life expectancy established by a particular policy, as most of the investors' contracts required.

II.    Discussion

Of the five issues presented for appeal, only two, the jury instruction issue[6] and

---

[4] Zima's precise testimony was that Girardot "was there" and that she remembered him "being present" during the alteration of the contracts.

[5] Svete's control of the company is evidenced by his control of the money maintained therein. Svete arranged for Girardot to withdraw $1.9 million from the premium reserve account and transfer that money to Svete. Svete then closed the company and suggested that LCI hire Girardot.

[6] Although Girardot did not follow FED. R. APP. P. 28(i) and explicitly adopt Svete's arguments by reference in his brief, the Court will give Girardot a generous benefit of the doubt and conclude that Girardot adopted Svete's jury instruction argument at oral argument. Counsel for Girardot was asked at the outset of oral argument whether sufficiency of the evidence was his only ground for appeal. Counsel for Girardot answered in the affirmative. Then, at the conclusion of his argument, counsel for Girardot asked for leave to adopt the briefs of Svete.
Ordinarily, we would limit Girardot's appeal to the issue raised in his brief. However, we have discretion to suspend the Federal Rules of Appellate Procedure for "good cause." *See* FED. R. APP. P. 2. Believing it anomalous to reverse one conviction and not another when both defendants suffer from the same error, we consider Svete's argument regarding the improper jury instruction to be adopted by Girardot. *See United States v. Gray*, 626 F.2d 494, 497 (5th Cir. 1980) (citing *United*

the sufficiency of the evidence issue, are attributed to both defendants. Only Svete asserts potential *Brady* and *Giglio* violations, and there exists no good cause to attribute those arguments to Girardot. *See* n.6, *supra*. It is under this framework that we begin substantive review of the issues presented.

A.    Sufficiency of the Evidence

We address the sufficiency of the evidence at the outset, as a finding of insufficient evidence would obviate any need to consider the alleged trial errors. *See United States v. Smith*, 459 F.3d 1276, 1286 (11th Cir. 2006); *United States v. Bobo*, 419 F.3d 1264, 1268 (11th Cir. 2005) (noting the Court's prudential rule "that requires the court to review sufficiency of the evidence claims raised by defendants, even if resolution on alternative grounds would otherwise dispose of the case"). We review the record for sufficiency of the evidence *de novo* in the light most favorable to the government. *See United States v. Brown*, 40 F.3d 1218, 1221 (11th Cir. 1994) (citing *United States v. Harris*, 20 F.3d 445, 452 (11th Cir. 1994), *and United States v. Camargo-Vergara*, 26 F.3d 1075, 1078 (11th Cir. 1994)). For there to be sufficient evidence from which a reasonable jury could find guilt,

> [i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established

---

*States v. Anderson*, 584 F.2d 849 (6th Cir. 1978)).

guilt beyond a reasonable doubt. A jury is free to choose among the constructions of the evidence.

*Brown*, 40 F.3d at 1221 (citing *Harris*, 20 F.3d at 452). That is, where testimony may lead to one or more conclusions, it is for the jury to decide the outcome. *See Harris*, 20 F.3d at 452. If, on the other hand, the record reveals a lack of substantial evidence from which a fact-finder could find guilt beyond a reasonable doubt, we must reverse the defendant's conviction. *See id*.

Both Girardot and Svete contend that the evidence presented by the government was insufficient to support their convictions. Each defendant, however, makes separate arguments regarding the sufficiency of the evidence. The Court first addresses the argument made by Girardot.

### 1. Girardot

Girardot argues that the government failed to provide substantial evidence of his knowing participation in any scheme to defraud. Indeed, knowing participation is relevant to each of the charges.

To sustain the conspiracy counts (Counts One and Two), the government must prove that Girardot knew of the essential nature of the charged conspiracy and that he voluntarily joined the conspiracy. *See United States v. High*, 117 F.3d 464, 468 (11th Cir. 1997); *United States v. Miller*, 22 F.3d 1075, 1080 (11th Cir. 1994).

Similarly, to sustain the conviction for mail fraud (Counts Three through Seven), the government must prove the existence of a scheme to defraud that involved use of the mails for the purpose of executing the scheme, and the defendant's specific intent to commit fraud. *See United States v. Bethea*, 672 F.2d 407, 410 (11th Cir. 1982) (citations omitted). Proof of actual reliance by the victim and proof of damages are not required. *See United States v. Yeager*, 331 F.3d 1216, 1221 (11th Cir. 2003) (citing *United States v. Brown*, 79 F.3d 1550, 1557 n.12 (11th Cir. 1996), *and Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir.1991)).

Finally, to sustain the remaining convictions for interstate transportation of money obtained by fraud (Counts Eight, Nine, and Ten), the Court must conclude that a reasonable fact-finder could determine that the defendants knew that certain property of a value in excess of $5,000 had been obtained by fraud and that the defendants caused that fraudulently obtained property to be transported in interstate commerce. *See United States v. Ross*, 131 F.3d 970, 986 (11th Cir. 1997).

### a. Evidence Specific to the Charged Offenses

Girardot contends that the evidence presented by the government of his knowing participation in the scheme to defraud was flawed and insufficient to establish his guilt. Specifically, he argues that the only evidence presented by the government to establish his knowing participation was: (1) Charme Austin's

testimony that Girardot was falsifying life expectancies at Medical Underwriting, Inc.; (2) Nanette Zima's testimony that Girardot participated in the alteration of existing contracts with investors by changing pages in them; and (3) LCI accountant Cindy Kienenger's testimony that Girardot can be tied to two improper transfers of money, one in 1998 and the other in 2000. Essentially, Girardot's argument is that these witnesses, who testified to the best of their recollections, should not have been relied upon by the jury to establish guilt because other constructions of their testimony exonerating Girardot were possible.

Girardot's argument is not only flawed under the clear holding in *Brown*, 40 F.3d at 1221, which permits the jury to choose among constructions of the evidence, but also fails because the evidence of Girardot's knowing participation in the scheme to defraud encompassed much more than the three areas outlined by Girardot. Trial testimony revealed that Girardot was Svete's "right hand man," someone who "knew everything" there was to know about LCI. Girardot was the "go-between" for marketing materials created by Svete's Dove Creative, Inc. These materials inaccurately stated that Svete's companies were independent and operated by medical professionals who, where applicable, contacted up to ten doctors for mortality reports. Girardot was also responsible for selecting files for MUI's audit, choosing only those that did not disclose the existence of fraudulently obtained policies. Later, when

11

several of the fraudulently obtained policies were cancelled, Girardot authorized a letter to investors which misrepresented that the policies had matured and encouraged investors to roll their money over into a new account. The sum of this evidence was clearly sufficient to sustain Girardot's convictions.

### b. Girardot's Testimony

Perhaps the most substantive evidence of Girardot's guilt is his own testimony. It is axiomatic that a defendant in a criminal case may choose whether to testify in his or her own defense. However, the decision of a criminal defendant to testify presents a substantial risk of not only bolstering the government's case, but also providing substantive evidence of his or her own guilt:

> [A] statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt. By "substantive evidence" we mean evidence "adduced for the purpose of proving a fact in issue, as opposed to evidence given for the purpose of discrediting a witness (i.e. showing that he is unworthy of belief), or of corroborating his testimony." . . . [W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true. . . .

*United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (internal citations and quotations omitted).

Girardot testified under oath that he acted in good faith at all times. He also generally denied that he participated in or was aware of any wrongdoing by Svete.

12

The jury, however, who actually heard Girardot's testimony and witnessed his demeanor[7] on the stand, was entitled to disbelieve Giradot's testimony. *See id.* Not only was the jury entitled to disbelieve Girardot, it was entitled to believe the exact opposite of what Girardot said. *See id.*; *see also Atkins v. Singletary*, 965 F.2d 952, 961 n.7 (11th Cir. 1992); *United States v. Sharif*, 893 F.2d 1212, 1214 (11th Cir. 1990).

"At least where some corroborative evidence of guilt exists for the charged offense . . . and the defendant takes the stand in his own defense, the defendant's testimony, denying guilt, may establish, by itself, elements of the offense." *Brown*, 53 F.3d at 314-15. This rule especially applies "where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge. . . ." *Id.* at 315 (citations omitted). In this case, we have both. As thoroughly discussed above, the government presented more than some corroborative evidence of guilt of the charged offenses. In fact, the evidence presented was in and of itself sufficient to support the convictions. Moreover, the highly subjective element of Girardot's knowledge is the evidence challenged by Girardot. That the jury disbelieved or believed the opposite of Girardot's testimony is the only

___

[7] "[W]here the issues in litigation involve highly subjective matters, the appearance and demeanor of the witnesses is of particular significance." *Brown*, 53 F.3d at 315 (citation omitted).

13

conclusion that can be reached by this Court. *See id.* at 314. This Court finds that the evidence was sufficient to support Girardot's conviction.

2. Svete

As to the sufficiency of the evidence, Svete appeals only the substantive mail fraud convictions and his convictions for interstate transportation of money obtained by fraud. Svete contends that a properly instructed jury could not have found beyond a reasonable doubt that a reasonably prudent investor would have relied on the charged misrepresentations. More specifically, Svete argues that because the investors signed contracts, which articulated the risks of the investment, it was unreasonable for any prudent investor to rely upon contrary statements made by the sales agents or the promotional literature. Because "[a] 'scheme to defraud' . . . has not been proved where a reasonable juror would have to conclude that the representation is about something which the customer should, and could, easily confirm–if they wished to do so–from readily available external sources," *Brown*, 79 F.3d at 1559, Svete contends that the government's evidence was insufficient to establish the substantive mail fraud counts and the counts for interstate transportation of money obtained by fraud.

Svete's argument fails for two reasons. First, Svete's scheme was so sophisticated and complex that even the most intelligent investor would have been

14

defeated in his quest for the truth. There was no information readily accessible in the public domain that the victims could immediately obtain to confirm or disprove the representations of the sales agents. *See United States v. Gray*, 367 F.3d 1263, 1270 (11th Cir. 2004). An illusion of independence and reliability was present with no way to ascertain that the viators were not terminally ill. Even if an investor actually visited the offices of MUI or LCI, they could not have learned the truth.

Second, and more importantly, Svete's argument fails under the reasoning of *United States v. Brown,* 53 F.3d 312. Like Girardot, Svete chose to testify in his own defense. The jury, who heard Svete's testimony and witnessed his demeanor, was entitled to disbelieve Svete's testimony and was entitled to believe the opposite of Svete's testimony. *Brown*, 53 F.3d at 314. Because of the combination of Svete's testimony and the other corroborative evidence supporting Svete's convictions, *see id.*, the evidence was sufficient to support Svete's convictions.

B.      The Jury Instructions

Defendants contend that the district court abused its discretion when it gave the pattern mail fraud charge to the jury instead of using language consistent with *United States v. Brown*, 79 F.3d 1550, 1557 (11th Cir. 1996). We review a question of the propriety of the jury instruction for abuse of discretion. *See United States v. Cornillie*, 92 F.3d 1108, 1109 (11th Cir. 1996) (citing *United States v. Morris*, 20

15

F.3d 1111, 1114 (11th Cir. 1994)).  Reversible error occurs only when the requested instruction: (1) was correct; (2) was not substantially covered by the charge actually given; and (3) dealt with some point in the trial so important that the failure to give the requested instruction seriously impaired the defendants' ability to conduct their defense.  *See United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999), *cert. denied sub nom.*; *see also United States v. Carrasco*, 381 F.3d 1237, 1242 (11th Cir. 2004) (internal citations omitted).

In this Circuit, mail fraud requires the government to prove that the defendant intended to create a scheme "reasonably calculated to deceive persons of ordinary prudence and comprehension."  *See Brown*, 79 F.3d at 1557 (citing *Pelletier*, 921 F.2d at 1498-99).  This burden is not reflected in the current Eleventh Circuit pattern jury instruction for mail fraud.  Pattern Instruction 50.1 merely states that a "scheme to defraud" is "any plan or course of action intended to deceive or cheat someone out of money or property by means of false or fraudulent pretenses, representations, or promises."  *Pattern Jury Instructions (Criminal Cases)*, No. 50.1 (11th Cir. Jud. Council 2003 rev.) (Mail Fraud).  Because the definition does not include the reasonable person standard as articulated in *Brown*, Pattern Instruction 50.1 is

deficient.[8] A more accurate definition of "scheme to defraud," tracking the language set out in *Pelletier* and *Brown*, would read: "The term 'scheme to defraud' includes any plan or course of action intended to deceive or cheat a person of ordinary prudence and comprehension out of money or property by means of false or fraudulent pretenses, representations, or promises."

The inaccuracy of the definition of "scheme to defraud" in the jury instruction seriously impaired defendants' ability to conduct their defense on the substantive counts of mail fraud. Defendants did not have the opportunity to argue in connection with charged law that the contracts, signed by the investors, made it unreasonable for any prudent investor to have relied upon contrary statements by sales agents or LCI's promotional literature. Defendants did not have the opportunity to argue in connection with charged law that investors should have sought independent advice on investing in viaticals. Such arguments are clearly contemplated by controlling law in this Circuit. Therefore, the district court abused its discretion when it did not include the *Brown*, 79 F.3d at 1557, language in the jury instruction. Svete and Girardot are entitled to a new trial on the substantive counts of mail fraud.

The incomplete jury charge did not however affect Defendants' ability to

_____

[8] "Scheme to defraud" is also insufficiently defined in Pattern Jury Instructions 50.2, 51.1, and 51.2.

conduct their defense as to the conspiracy counts and the counts for interstate transportation of money obtained by fraud. This Court has previously held that the elements of mail fraud need not be explained to the jury in a money laundering conspiracy case under 18 U.S.C. § 1956(h) because the government does not have to prove that a defendant committed mail fraud to obtain a conviction on conspiring to launder money. *See United States v. Martinelli*, 454 F.3d 1300, 1311 (11th Cir. 2006) ("The pattern mail fraud instruction, which details the affirmative actions a defendant must undertake to violate the mail fraud statute, simply does not apply in a money laundering conspiracy case, where the defendant need only have *knowledge* that the funds were derived from mail fraud."). The same logic applies to charges under 18 U.S.C. § 2314 where the defendant need only have knowledge that the property was derived from fraud. *See* 18 U.S.C. § 2314; *see also United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir. 1989) (upholding a jury charge on knowledge which stated: "the proof need not show who may have stolen the property involved, only that the Defendant knew it had been stolen or taken by fraud *at the time it was transported*"). The government does not have to prove that a defendant committed mail fraud to obtain a conviction on interstate transportation of money obtained by fraud. *See*

*Johnson v. U.S.*, 207 F.2d 314, 319 (5th Cir. 1953)[9] ("The gravamen of the offense prohibited by 18 U.S.C. § 2314 is the transportation in interstate or foreign commerce of goods with knowledge that they have been secured by the unlawful means referred to in the statute. It is immaterial whether the accused is guilty of any offense in connection with the primary wrongful taking of the goods, nor is it significant how the accused acquired possession of the goods, except that this may be shown in order to prove his knowledge of their character as being stolen, converted or taken by fraud."). Therefore, the district court did not abuse its discretion when it declined to instruct the jury on the requirement of an ordinarily prudent investor as to the counts of conspiracy to launder money and interstate transportation of money obtained by fraud. Svete and Girardot are not entitled to a new trial as to those convictions.

C.    The Motion for New Trial

Prior to sentencing, Svete moved the district court for a new trial based upon what he contends were *Brady* and *Giglio* violations. Svete points to inconsistencies between the trial and sentencing testimony of government witness Charme Austin. Svete insists that the district court was in error to deny the motion.

To resolve this issue, we must delve into the circumstances surrounding

---

[9]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit that were rendered prior to October 1, 1981.

19

Charme Austin and her testimony. Austin worked as a medical underwriter for Svete's companies and thus had knowledge of the scheme to defraud viatical investors. She explained that some life expectancies were created without doctor consultation and others were modified to fit particular portfolios. She referred to these processes as "falsifying life expectancies." Austin also testified that the scheme was dependent upon secreting Svete's involvement with LCI and MUI. Austin quoted Svete as saying that "when investors were looking on, that it would maybe to them seem not correct or not appropriate that he was overseeing both the underwriting company and the viatical company." Additionally, the scheme was furthered, according to Austin's testimony, by the use of inaccurate marketing materials that overstated the qualifications of LCI and MUI.

Austin's involvement with defendants led to her being scrutinized by the government for her own participation in the fraud. She was ultimately charged with conspiracy, pled guilty on August 30, 2004, testified on January 18 and 19, 2005, and was sentenced on May 6, 2005.[10] One week after Austin's sentencing, the

_____

[10]Following her guilty plea, Austin was interviewed by the government where she disclosed to the government that she had been the subject of a military disciplinary proceeding involving allegations of theft. She informed the government in the interview that the proceedings resulted in her receiving a "less than honorable discharge." This information was then disclosed to Svete and Girardot prior to her trial testimony and resulted in an on the record discussion with the district court. Svete, through his attorney, informed the district court that it was their "understanding . . . that not only was it a less than honorable discharge, it involved a theft, specifically that their were accusations that she either embezzled money or stole from the PX."

20

government filed a notice disclosing certain inconsistencies between her testimony at the trial and her testimony at her own sentencing. Specifically, there were three areas of concern. First, at her sentencing, Austin admitted that she had been incarcerated for ten months at military stockades in Germany and Colorado, following her court-martial for theft of property. During her trial testimony, however, Austin stated, in response to cross examination by Svete, that she had never been imprisoned.[11] Second, Austin admitted at sentencing that an adjudication against her had been withheld on September 19, 2004, in a grand theft charge in Broward County, Florida. That matter pertained to the use of a credit card to pay for storage charges. The government did not disclose this fact to the defense prior to the trial, and, accordingly, no line of questioning brought out the fact of the withheld adjudication. Finally, Austin revealed at sentencing that she had been in weekly counseling with a psychologist for three months in 1980 due to "concerns over the 'unreliability' of statements made by Austin and her behavior at home and school." Again, the government did not disclose this fact to the defense prior to the trial, and no line of questioning brought out the fact of the counseling.

---

[11] The testimony was as follows: Question: "And you've never been to prison before?" Answer: "No, actually." No one asked the witness what she meant by "No, actually."

The only argument for a new trial that has any potential merit is based on the government's failure to disclose Austin's confinement in the military stockades prior to trial.[12]  Had Austin's military stockade record been disclosed at the time of trial, Svete argues, the defense would have had powerful impeachment evidence and solid proof that Austin, a significant witness for the government, had lied during her trial testimony.[13]  We review the district court's denial of the motion for a new trial for abuse of discretion.  *See United States v. Kersey*, 130 F.3d 1463, 1465 (11th Cir. 1997); *see also United States v. Woodruff*, 296 F.3d 1041, 1043 n.1 (11th Cir. 2002).

---

[12] While Svete argues that the 2004 withheld adjudication and the weekly counseling sessions in 1980 each entitle him to a new trial under *Brady* or *Giglio*, it is not likely that either would have been admissible at trial.  Further, even if admitted, there is no reasonable likelihood that either item could have affected the judgment of the jury; therefore these items will not be addressed further.

As to the withheld adjudication, Federal Rule of Evidence 609 provides for impeachment by evidence of conviction of a crime.  A withheld adjudication generally does not fit that definition. *See United States v. Georgalis*, 631 F.2d 1199, 1202 (5th Cir. 1980) (holding that, while it was improper to impeach with an adjudication withheld since by operation of Florida law there existed no conviction, the error was harmless); *see also United States v. Chubbuck*, 252 F.3d 1300, 1305 (11th Cir. 2001) (citing *State v. McFadden*, 772 So. 2d 1209 (Fla. 2000)).

With regard to the weekly counseling sessions, which occurred more than twenty years prior to her testimony when the witness was in school, the prejudicial impact of allowing such information into evidence would clearly outweigh any value that such information might shed on Austin's credibility.

[13] We note that, in the context of *Giglio*, the statement must actually be false (as opposed to the mere suggestion of falsehood) in order to qualify as perjured testimony. *See Maharaj v. Sec'y. for Dep't of Corrs.*, 432 F.3d 1292, 1313 (11th Cir. 2005) (citing *Moon v. Head*, 285 F.3d 1301, 1315 (11th Cir. 2002), *and Brown v. Head*, 272 F.3d 1308, 1317-18 (11th Cir. 2001)).  While the government perhaps could have made an argument against the motion for a new trial on this ground –that a military stockade is different from imprisonment or that the witness did not say "no," but instead said "no, actually"–they did not.  Regardless, the district court's denial of the motion for a new trial is affirmed herein on different grounds.

1.      Standards Governing *Brady* and *Giglio* Violations

To establish a *Brady* violation, Svete must show: (1) that the government possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different. *See United States v. Perez*, 473 F.3d 1147, 1150 (11th Cir. 2006); *see also Woodruff*, 296 F.3d at 1043 n.1. Failure to meet any one of these elements will defeat a motion for a new trial. *See United States v. Starrett*, 55 F.3d 1525, 1554 (11th Cir. 1995).

"*Giglio* error is a species of *Brady* error that occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *Ventura v. Attorney Gen., Fla.,* 419 F.3d 1269, 1276 (11th Cir. 2005) (internal quotations and citations omitted). "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Giglio*, 405 U.S. at 154; *see also Jennings v. McDonough*, 490 F.3d 1230, 1236 (11th Cir. 2007). Further, the materiality standard under *Giglio* is less stringent than under a garden variety *Brady* claim; under *Giglio*,

a failure to disclose evidence is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *See Grossman v. McDonough*, 466 F.3d 1325, 1342 n.14 (11th Cir. 2006) (quoting *Ventura* 419 F.3d at 1278). Therefore, if a defendant fails to articulate a *Giglio* violation, a *Brady* violation cannot exist. *See Williams v. Griswald*, 743 F.2d 1533, 1542 n.22(11th Cir. 1984) ("[A]s a result, it is not necessary in this case to address the possible *Brady* violations because a *Giglio* criterion will suffice for our purposes."); *see also Brown v. Head*, 272 F.3d 1308, 1317 (11th Cir. 2001) ("The materiality prong is easier to establish with *Giglio* claims than with *Brady* claims.").

2.     The Government's Duty

What then was the government required to do? First, the government was required to disclose any *material* evidence that it possessed that was favorable to the defendant that (1) the defendant did not possess and (2) could not have been obtained by the Defendant himself with reasonable diligence. The government further had the duty to step forward and disclose "[i]f false testimony surface[d] during [the] trial and the government [had] *knowledge* of it. . . ." *Brown v. Wainwright*, 785 F.2d 1457, 1464 (11th Cir. 1986) (emphasis added). "That the prosecutor . . . chose not to run an FBI or NCIC check on the witness, does not change 'known' information into

24

'unknown' information within the context of the disclosure requirements." *United States v. Auten,* 632 F.2d 478, 481 (5th Cir. 1980).

Austin disclosed to the government that while she was in the military, she had been subjected to a disciplinary proceeding stemming from an allegation of theft for which she received a "less than honorable discharge." What she failed to tell the government, and the government failed to discover prior to her testimony, was that she had also served time in the military stockades as a result of the charge. Although the government revealed the information it had to the defense prior to her testimony, it did not reveal Austin's confinement in the military stockades and did not "step forward" and disclose the apparent inconsistency in her testimony when she denied imprisonment.[14]

### 3.    Materiality of the Evidence

Whether the government's failure to disclose should result in a new trial is largely dependant upon whether the evidence was *material*.[15] Evidence is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *See Grossman*, 466 F.3d at 1342 n.14.

---

[14]*See* n.10, *supra*.

[15]For the purpose of this analysis, we will assume, but not decide, that Svete did not possess and could not have obtained the information himself with the exercise of reasonable diligence.

Whether the false testimony offered . . . could in any reasonable likelihood have affected the judgment of the jury must be analyzed in light of a number of highly context-specific factual considerations, including the importance of the testimony of the falsely testifying witness to the government's case, the nature and significance of the falsehood, and, notably, to what extent the witness's testimony is substantially corroborated by other evidence.

*Ventura*, 419 F.3d at 1281.

> a.  Importance of the Testimony of the Witness and Purpose of Impeachment

When discussing Austin's military discharge record with the district court, Svete made it clear that his purpose in asking about the record was to demonstrate that Austin had said something different in obtaining her employment with Svete. This testimony supports one of the defenses theories–that Austin was manipulating and misleading Svete. This conclusion is supported by the fact that Svete did not seek the assistance of the district court in obtaining further information about the theft aspects of the military discharge even though he confirmed to the district judge that he knew theft was involved. For that matter, when Austin was asked whether she had ever been in prison, it was not in an effort to impeach her with past criminal conduct. Instead, it is clear from the context of the questions that Svete was attempting to establish a motive for Austin to be less than truthful. That is, since she had never

26

been to prison before, she would say anything the government wanted to keep from going to prison.

Svete had sufficient information from the government's disclosure to conclude that Austin had been the subject of some type of proceeding arising from a charge of theft in the military that resulted in at least her less than honorable discharge. He obviously decided not to pursue that line of impeachment. His impeachment of Austin was clearly a two-edged sword for the defense. A thorough review of Austin's testimony reveals that she was, in many respects, a positive witness for Svete and attacking her credibility would have distracted from that evidence. For example, she revealed that she exerted a significant amount of control over MUI. She related in her testimony that it was her idea to hire three doctors as MUI staff. She confirmed that she was the signatory on MUI's bank accounts. She held 25,000 shares of MUI stock. Austin further described how she refused to "sign over" her MUI ownership to Svete when he asked her for it, informing him that she had worked too hard to just sign it over. She also related to the jury how she received a significant sum of money from the sale of MUI. Thus, Austin's testimony was arguably, at least in part, beneficial to Svete.

b.    Other Impeachment of the Witness

27

Austin's failure to admit that she spent time in the military stockades is troubling, but had she made such an admission, she would have only enabled the defense to beat an already dead horse. In short, it would have made no difference. *See LeCroy v. Sec'y, Fla. Dep't of Corrs.*, 421 F.3d 1237, 1267 (11th Cir. 2005). Austin's trial testimony is riddled with successful impeachment. Austin admitted that certain portions of her resume concerning her educational background, work experience, and prior salaries were inaccurate. She admitted that she knowingly allowed marketing materials for Svete's companies to misrepresent her work experience, labeling her as a nurse when in fact she only had experience as a patient care technician. She admitted that she had pled guilty to the criminal acts stemming from the facts of this very case. She was presented with portions of her grand jury testimony which were inconsistent with her trial testimony. Further, she was anything but forthcoming in her testimony, choosing instead to be continuously evasive in her responses. Thus, an admission from Austin that she had been in military stockades would have had little, if any, impact on the jury's evaluation of her testimony. *See id.*

c.    Corroborating Evidence

Where the government's case depends almost entirely on the testimony of a single witness, such witness's credibility is undeniably essential to the jury's

28

evaluation of the evidence. *See generally Giglio*, 405 U.S. 150. But where, as here, several independent witnesses testify regarding the same illegal acts, the impeachment of any single witness is less likely to meet the materiality prong and thus require a new trial. *See United States v. Noriega*, 117 F.3d 1206, 1219 (11th Cir. 1997).

When Austin was sentenced on May 6, 2005, the court addressed her as follows:

> [T]he lion's share of your testimony or the pertinent portion of your testimony was corroborated by other witnesses, and for that reason the motions to strike were denied and I think the jury figured out the same thing, that others corroborated your testimony, gave credence to it and, thus, they credited your testimony about the life expectancies and about what was going on at LifeTime Capital and MUI.

Indeed Austin's testimony was well-supported by other witnesses, as evidenced by the following non-exhaustive examples:

- Nanette Kveder-Zima testified that Svete instructed that life expectancy sheets were not to be given to salesmen and that LCI often "guessed" life expectancies instead of sending medical records to doctors for review. She testified that Svete himself would "chop[] off [or change] life expectancies" to make policies more attractive. She testified that Svete instructed her to alter existing contracts by removing the phrases "terminally ill" and "by a physician" because "that would be similar to what the original document said, but would not legally bind LifeTime Capital in the same manner that 'terminally ill' and 'physician' would." She testified that Svete owned and directed MUI, despite the fact that it gave the appearance of being a separate company.

29

- Brian Barclay, Assistant Network Administrator and later Supervisor of Funding Operations at LCI testified that he was informed by Shausta Merrill, an LCI employee, that LCI would not receive medical summaries regarding life expectancies signed by doctors. Instead, "the life expectancies that I would be receiving would be a cover letter signed by [a representative of MUI]."

- David Ganzsanto, an LCI employee responsible for developing relationships with brokers to bring in insurance policies, testified from personal experience that LCI was not buying policies on terminally ill patients as represented to investors.

- David Kozee, an account executive, was told by Girardot that the company sold products involving the terminally ill, and when Kozee asked for medical information to establish life expectancies, Svete told him to make it up.

- Steven Stucker, formerly an attorney with Laughlin and Associates in Nevada, testified that Svete used Laughlin's services to secrete his involvement in "several corporations."

Clearly, Austin's testimony was not the lynchpin of the government's case.

### 4. Motion for New Trial Properly Denied

Had Austin disclosed her incarceration from the witness stand when asked by Svete, this issue would not have been made the subject of his appeal. Further, had Svete sought the assistance of the district court in determining the details of the military theft charge, it also may have prevented the need for this discussion. That is not to say, however, that even if Svete had known of the incarceration in the

30

military stockades he would have chosen to utilize that information or been allowed to impeach Austin with it.[16]

Despite the government's failure to disclose the incarceration, this defect does not rise to the level of requiring a new trial under *Brady* or *Giglio*. Ample corroborating and other impeachment evidence allowed the jury to effectively determine what weight, if any, to afford the testimony of Charme Austin.

D.      Sentencing Issues

Svete contends that the district court miscalculated the loss to investors, finding it exceeded $80,000,000.00 under U.S.S.G. § 2F1.1, and improperly included within the restitution order amounts to pay life insurance premiums to maintain the viability of the viatical portfolios. Both arguments fail.

1.      Loss Calculation

We review a district court's determination of the amount of loss involved in an offense for clear error. *See United States v. Woodard*, 459 F.3d 1078, 1087 (11th Cir. 2006). Section 2F1.1 "compels the district court to increase a defendant's

---

[16]The transcript reflects that the district court ruled from the bench, immediately prior to Austin taking the stand, that Svete would be allowed to inquire of Austin as to the statements she made regarding her military discharge. That was all Svete had sought permission to do in his cross-examination of Austin despite the fact that he knew theft was involved. The district court then concluded its remarks on that issue by saying that the conduct that led up to the discharge was neither probative or relevant and was "not helpful to anyone." This ruling by the district court was not made the subject of any argument by either side of this appeal.

offense level based on the loss attributable to that defendant." *United States v. Dabbs*, 134 F.3d 1071, 1081 (11th Cir. 1998) (citing *United States v. Calhoon*, 97 F.3d 518, 530 (11th Cir. 1996)). Where the loss exceeds $80,000,000.00, the offense level is increased by 18. *See* U.S.S.G. § 2F1.1(b)(1)(S) (2000) (deleted November 2001 and consolidated with § 2B1.1). Such loss must be proven by the government by a preponderance of the evidence. *Dabbs*, 134 F.3d at 1081. This burden is satisfied with "reliable and specific evidence." *Id.* (quoting *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997)). However, "the loss amount does not need to be precise and may only be a reasonable estimate of the loss based on the available information." *Woodard*, 459 F.3d at 1087 (citing U.S.S.G. § 2B1.1, cmt. n.3 (2000)).

A preponderance of the evidence developed at trial established that the victim-investors lost in excess of $80 million. Although Svete contends that the loss attributable to him should be measured *only* by the amount by which selling prices were inflated by false misrepresentations, fraudulent schemes come in various forms and may require different methods to calculate loss. *See United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996). This Court has upheld methods which hold "a defendant fully accountable for all losses suffered by those victims who lose money, but does not allow the defendant to fully benefit from payments made to others." *Id.*

32

at 334. For example, we have affirmed a district court's loss determination as to all amounts fraudulently received by a defendant where coin investors received coins but lost the expected opportunity for appreciation. *United States v. Funt*, 896 F.2d 1288, 1299 (11th Cir. 1990). We have similarly rejected arguments that no loss incurred where the property may be recovered or is of no value to others. *See United States v. Jenkins*, 901 F.2d 1075, 1083 (11th Cir. 1990) (considering non-negotiable securities); *see also United States v. Goldberg*, 60 F.3d 1536, 1540 (11th Cir. 1995) (considering stolen unexecuted bonds).

During the sentencing hearing, Svete did not challenge the qualifications of the Receiver or present evidence to contradict his testimony. The Receiver testified that the loss to the victim-investors could be as high as $114 million and would be in excess of $80 million even if the value of the portfolios was considered, as Svete suggests. Recognizing the difficulty in determining an exact loss amount, the district court reasonably found a loss of $100 million. As the district court correctly concluded, it was "certainly over 80 million" based on the reliable testimony presented. Therefore, the district court did not err when it increased Svete's offense level by 18 under § 2F1.1.

　　　　2.　　Restitution

Because Svete did not raise the argument that the restitution order was improper in the district court, we review for plain error. *See United States v. Odom*, 252 F.3d 1289, 1299 (11th Cir. 2001) (holding that if a defendant fails to challenge a restitution order at sentencing, review is for plain error only). Under this standard of review, a defendant "must show that: (1) an error occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." *United States v. Gresham*, 325 F.3d 1262, 1265 (11th Cir. 2003) (citing *United States v. Humphrey*, 164 F.3d 585, 588 n.3 (11th Cir. 1999)). Where neither precedent nor the explicit language of the statute specifically resolves an issue, plain error cannot exist. *See United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003) (citing *United States v. Magluta*, 198 F.3d 1265, 1280 (11th Cir. 1999) ("[A] district court's error is not 'plain' or 'obvious' if there is no precedent directly resolving an issue"), *vacated in unrelated part on other grounds*, 203 F.3d 1304 (11th Cir. 2000)).

Neither the Eleventh Circuit nor the Supreme Court has determined whether funds to ensure the viability of fraudulently induced investments may be included in a restitution order. As such, if there was error, it was not plain. *See Lejarde-Rada*, 319 F.3d at 1291. The district court, therefore, did not plainly err when it included

34

$5 million per year for the payment of life insurance premiums to maintain the viability of the portfolios. *See Id.*

III. Conclusion

Defendants' convictions on Counts Three through Seven are **VACATED** and **REMANDED** for a new trial based on the erroneous jury instruction. Defendants' convictions as to Counts One, Two, Eight, Nine, and Ten are **AFFIRMED**. The sentences as to all counts, while they may be wholly accurate, are **REVERSED** for re-sentencing consistent with this opinion.